[Crim. No. 2642. In Bank.—July 30, 1924.]

THE PEOPLE, Respondent, v. R. A. BOGGESS, Appellant.

[1] CRIMINAL LAW—CORPORATE SECURITIES ACT—FALSE STATEMENTS—STATUTORY CONSTRUCTION — PERMIT. — Both the language and the evident purpose of section 14 of the Corporate Securities Act indicate that it was intended to make it a public offense for an applicant for issuance of stock of a corporation to include any material false statement in the application for a permit; and a false statement in an application for a permit to issue stock of a mining corporation with reference to the past production of the mine comes within the provisions of the statute.

[2] ID. — FALSE STATEMENT — APPLICATION FOR A PERMIT — FILING—VENUE.—Where an application for a permit to issue corporate stock, which contained a false statement, was filed by the applicant in a branch office of the corporation commissioner and forwarded to the deputy commissioner, whose duty it was to examine it at the main office in another county, the superior court in the latter county had jurisdiction of a prosecution on a charge of violating the Corporate Securities Act.

[3] ID.—REVIEW OF EVIDENCE—ERRORS AND IRREGULARITIES.—In this prosecution for violation of the Corporate Securities Act it is held, after a review of the evidence, that the evidence was not so overwhelming as to compel the conclusion that the verdict of the jury would have been the same regardless of the errors and irregularities occurring in the trial and that said errors and irregularities tended to the prejudice of the defendant and the defendant's case to such an extent that they proved an important factor in the determination by the jury of the guilt of the defendant, and that notwithstanding the rule that if there be any substantial evidence in the record tending to support a verdict the judgment based thereon should be sustained, the judgment in this case should be reversed.

———

1.  See 6 Cal. Jur. 778.

[4] Id.—Evidence—Experts.—In such a case, where it was the apparent theory of the defense in part that the relative cost of treating high-grade ore was less than the cost of treating low-grade ore, it was error to sustain an objection to a question asked a witness for the defense, "From your experience, would you say it would cost any more per ton to treat low-grade ore or high-grade ore?" the objection being that the witness was not an expert and that his experience was confined largely to one mine.

[5] Id.—Nonexpert Witnesses.—It is a generally recognized rule that the opinions of nonexpert witnesses are admissible upon a great variety of unscientific questions arising every day and in every judicial inquiry.

[6] Id.—Opinion Evidence.—Opinion evidence is that which is given by a person of ordinary capacity who has by opportunity acquired a particular knowledge which is outside the limits of common observation and which may be of value in illustrating a matter under consideration; and the opinions of nonexpert witnesses may be received in evidence when the witnesses have by their experience gained an acquaintance with a particular subject matter not common to others and which may aid the jury in coming to a conclusion.

[7] Id.—Qualifications of Witness.—If a witness has had ample opportunity of acquiring particular knowledge with reference to a particular process employed in a particular business, his opinion is not to be rejected because perchance he may be engaged in several other separate and distinct occupations, nor is his opinion to be rejected even though it is based upon observation and experience acquired in the operation generally of a business, rather than in the detailed operation of that business.

[8] Id.—Experience in Particular Place.—In such a case the witness whose opinion was sought on the cost of production of ore was not required to have obtained his information at the particular mine in question.

[9] Id.—Cost of Treating Ore.—The difference in the cost of treating high and low grade ore is not a matter of such common knowledge that a jury may be assumed to know what that difference is without receiving evidence upon the subject.

[10] Id. — Minutes of Corporation — Immateriality of. — In such a case the minutes of the mining corporation, which did not show or tend to show the falsity of the statement upon which the prosecution was based, should have been excluded from evidence on the objection of the defendant that they were irrelevant, immaterial, and incompetent.

5. See 10 Cal. Jur. 952; 11 R. C. L. 568.

6. See 11 R. C. L. 562.

7. See 10 Cal. Jur. 958; 11 R. C. L. 574.

[11] ID.—PROOF OF INCUMBENCY OF OFFICER.—In such a case such minutes were not admissible to prove that the defendant was an officer and agent of the mining company, where the fact was otherwise established and undisputed in the case.

[12] ID. — OBJECTION TO EVIDENCE — GROUNDS. — While it is true ordinarily that an objection to evidence must be sufficiently specific to inform the court of the scope of objection, nevertheless, where the record shows that all the parties, including the court, must have understood the purpose of the objection, it will not be considered that the objection failed of its purpose.

[13] ID. — REPORT OF DEFENDANT — WHEN INADMISSIBLE. — In such a case a previous report made by the defendant as receiver of the mine to a court is inadmissible to show defendant's knowledge of the falsity of the statement upon which he is prosecuted where the report does not show or tend to show any such knowledge.

[14] ID. — VALUE OF ORE—EVIDENCE—SIMILAR CONDITIONS—TIME.—In such a case evidence as to the low percentage of quicksilver extracted from the mine in question is inadmissible unless it is shown that the quicksilver was obtained under conditions similar to those existing at the time of the occurrence upon which the charge under prosecution occurred.

[15] ID.—REMOTENESS OF EVIDENCE—DISCRETION.—There is no hard-and-fast rule relative to the admission of evidence claimed to be too remote, and ordinarily an objection on this ground goes to the weight of the evidence, but there may be instances in which the remoteness will be so great as to render the proffered evidence utterly unsatisfactory and immaterial; this must depend largely upon the circumstances of each particular case, and as the law does not fix any particular limitation of time which will render evidence too remote, its admissibility in the face of objection upon this ground ordinarily should be left to the sound discretion of the trial court.

[16] ID.—SIMILAR CONDITIONS—TIME—ABUSE OF DISCRETION.—In such a prosecution evidence as to the low percentage of quicksilver extracted from ore taken from the mine sixteen years subsequent to the time mentioned in the alleged false statement, without a showing that the existing conditions upon which the evidence was based were identical with or substantially similar to the conditions existing at the previous time, is inadmissible, and it was an abuse of discretion tending to defendant's prejudice for the trial court to admit it.

12.  See 10 Cal. Jur. 822; 26 R. C. L. 1048.
14.  See 10 Cal. Jur., 861; 10 R. C. L. 1002.
15.  See 10 Cal. Jur.  808.

[17] ID. — MISCONDUCT OF JUDGE. — Remarks of the trial judge constituting a comment upon a · particular piece of evidence which doubtless tended to lead the jury to believe that the court was suspicious of the defendant, and naturally must have been understood by the jury as an argument against the defendant, are improper and beyond the privilege of the court.

[18] ID.—DUTY OF TRIAL COURT—EXAMINATION OF WITNESSES.—It is the duty of the trial court, if the exigencies of the case require it, to facilitate, by one or more proper interrogatories, the direct and cross-examination of a witness; but for the court to repeatedly take the defendant as a witness out of the hands of his counsel who is apparently competent, conscientious, and expeditious in his conduct of the case, and proceed along an independent .and extensive line of examination and cross-examination, is not only not commendable, but highly irregular, and for the sake of due and orderly administration of justice should not be indulged in.

---

(1) 37 C. J., p. 278, ,sec. 172.   (2) 37 C. J., p. 278, sec. 172. (3) 17 C. J., p. 367, sec. 3750 (1926 Anno.).   (4) 22 C. J., p. 546, sec. 642.   (5) 22 C. J., p. 537, sec. 624.   (6) 22 C. J., pp. 519, 536, secs. 605, 624.   (7) 22 C. J., pp. 518, 521, secs. 605, 606.   (8) 22 C. J., p. 520, sec. 606.   (9) 22 C. J., p. 546, sec. 642.   (10) 16 C. J., p. 876, sec. 2198; 37 C. J., p. 279, sec. 172.   (11) 16 C. J., p. 859, sec. 2165.   (12) 16 C. J., p. 877, sec. 2199; 17 C. J., p. 222, sec. 3569 (1926 Anno.).   (13) 37 C. J., p. 279, sec. 172.   (14) 16 C. J., pp. 750, 751, sec. 839.   (15) 16 C. J., pp. 561, 562, sec. 1087.   (16) 16 C. J., p. 750, sec. 839; 17 C. J., p. 241, sec. 3581.   (17) 16 C. J., p. 832, sec. 2102.   (18) 16 C. J., p. 831, sec. 2100 (1926 Anno.).

APPEAL from a judgment of the Superior Court of Sacramento County. Charles O. Busick, Judge. Reversed.

The facts are stated in the opinion of the court.

George E. Foote and E. S. Bell for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

LENNON, J.—The defendant was convicted of an alleged violation of section 14 of the "Corporate Securities Act," which provides that, "Every officer, agent or employee of

---

18.   Power of court to examine witness, notes, 38 Am. St. Rep. 895; 6 Ann. Cas. 477; 57 L. R. A. 882; L. R. A. 1916A, 1199. See, also, 28 R. C. L. 587.

any company, . . . who, with knowledge of its falsity, files or causes to be filed in the office of the commissioner any false statement or representation concerning such company or the property which it then holds or proposes to acquire, or concerning its officers or its financial condition or other affairs, . . . is guilty of a public offense and shall be punished by imprisonment in the state prison not exceeding five years, or in a county jail not exceeding two years, or by a fine not exceeding five thousand dollars, or by both such fine and imprisonment.'' (Stats. 1917, sec. 14, p. 680.) The charging part of the information filed against the defendant is that, ''The said R. A. Boggess on the —— day of April, A. D. 1920 in the said County of Sacramento, in the said State of California, and before the filing of this Amended Information, did then and there willfully and unlawfully and feloniously file and cause to be filed in the Office of the Commissioner of Corporations of the State of California, an application of ALPHA QUICKSILVER COMPANY, a corporation, for a permit to issue securities; that in said application was contained and embodied the following statement concerning the property held by such company, 'During the time Boggess had absolute charge of the operations at the mine in 1900–1 and 2, he made it pay net over $7000.00 per month, NET over all mine operating expenses, quicksilver selling at an average of $45.00 per flask'; that said statement so contained and embodied in said application as aforesaid, is and was false and that said defendant so made said statement in said application with knowledge of its falsity; that at the time said statement was filed or caused to be filed as aforesaid, the said R. A. Boggess was an officer, agent and employee, of said Alpha Quicksilver Company, contrary to the form, force and effect of the Statutes in such case made and provided, and against the peace and dignity of the People of the State of California.''

[1] Upon behalf of the defendant it is contended at the outset that the amended information does not state a public offense in this, that the alleged false statement was a matter that was entirely immaterial because it was not required by the provisions of the Corporate Securities Act, which provides that, ''Such application shall be in writing, shall be verified as provided in the Code of Civil Procedure for the verification of pleadings, and shall be filed in the office of

the commissioner. In such application the applicant shall set forth the names and addresses of its officers, the location of its office, an itemized account of its financial condition, the amount and character of its assets and liabilities, a detailed statement of the plan upon which it proposes to transact business, a copy of any security it proposes to issue, a copy of any contract it proposes to make concerning the same, a copy of any prospectus or advertisement, or other description of such securities, then prepared by or for it for distribution or publication, and such additional information concerning the company, its condition and affairs as the commissioner may require." (Stats. 1917, sec. 3, p. 675.)

It is argued that the amended information does not state an offense because there is nothing within the requirements of the section of the statute just above quoted which calls for any statement of the past resources and past production of any mine or any other property upon which an application is made for the issuance of securities. It is insisted that the fact that the mine in the instant case may or may not have produced $7,000 per month net at a period twenty years or more before the filing of the application in the instant case was a matter entirely immaterial to the application, and, therefore, foreign to any consideration required to be given to the application and consequently did not in any way tend to affect or influence the corporation commissioner in his judgment, based upon such application, as to whether or not the permit to issue securities should be granted.

Although the alleged act was not within the letter of the provisions of section 3 of the "Corporate Securities Act" by reason of the fact that such statement of past production is not specifically required by said section, still section 14 of the "Corporate Securities Act," which defines the crime and declares the penalty is very broad in its scope in that it declares the filing of *any* false statement to be a public offense. The fact that the alleged false statement was not required by section 3 of the "Corporate Securities Act" does not relieve the defendant from the penalty prescribed by section 14 thereof. The conclusion to be reached by the commissioner of corporations as to the propriety of granting or refusing the permit to issue securities would, of course, be based upon *all* of the facts contained in the application for the permit. The false statement charged against the de-

fendant was obviously included in the application to influence the commissioner of corporations in his action upon the application. True, it was a statement of past conditions, but it was evidently included in the application in order that from such past condition the future performance of the mine might be favorably inferred, and, therefore, be made the basis for a favorable consideration of the application. That it was material cannot be doubted for it tended to show that under proper management, and particularly under the management of the defendant Boggess, the mine could still be made to pay net $7,000 per month. That it had done so once and that it could be made to do so again was the effect of the statement. This statement would undoubtedly tend to influence the corporation commissioner in passing upon the application. Clearly, it was the purpose of section 14 of the statute to prevent the inclusion in the application of *any* false statement by reason of which an erroneous conclusion as to the granting of a permit might be reached by the commissioner. Both the language and the evident purpose of the statute indicates that it was intended by the provisions of section 14 to make it a public offense for an applicant to include any material false statement in the application for a permit. The amended information in the instant case, therefore, stated a public offense.

[2] It is also urged by defendant as a ground for the reversal of the judgment rendered that the offense of filing the false statement with the commissioner of corporations, was committed in the city and county of San Francisco, and, therefore, the superior court in and for Sacramento county had no jurisdiction to try the case. It is an undisputed fact in the case that the application was taken by an attorney for the mining company, at the request of the defendant, to the branch office of the commissioner of corporations in San Francisco on the third day of April, 1920, and delivered by him to the party in charge of the branch office, and that the filing fee was paid by said attorney at the same time at the branch office of the commissioner of corporations in San Francisco. The evidence also shows, however, that the application was subsequently and in due course forwarded by the deputy in charge of the branch office in San Francisco to the principal office in Sacramento and finally filed there.

Whether or not the court had jurisdiction to try the instant case depends upon a determination of the question of whether or not the act of filing or causing to be filed a false statement in the office of the commissioner of corporations was completed when the application was left at the branch office of the commissioner of corporations at San Francisco. The fact that the application was left at the branch office at San Francisco in charge of a deputy and the filing fee paid there, coupled with the fact that, at the time the application was filed, it was customary for applications to be acted upon and permits granted either by the principal office at Sacramento or the branch office at San Francisco does not compel the conclusion that the application, as a matter of law, was finally filed in the San Francisco office.

A final filing may consist of the mere physical act of the person leaving a paper at the proper office with the person in charge thereof to be filed. This is the character of the filing referred to by those cases fixing the time of the accrual of certain rights in civil matters dependent upon the filing of certain papers. In such cases it is of course but proper that the right arising from the filing of certain papers should accrue as soon as the person filing the papers has done all in his power to perfect the filing; that is to say, as soon as he has left the papers with the proper officer for filing. (*Estate of Carroll*, 190 Cal. 105 [210 Pac. 817].) Obviously, a filing, however, is not fully completed as a foundation for a right where the paper filed, before it is acted upon, must, or may be, forwarded for filing and consideration to another office of the same or some other governmental or ministerial department of the state or a political subdivision thereof.

The main office of the commissioner of corporations as provided by law was in Sacramento, and the application in the instant case, relating as it did to mining matters, required the attention and approval of a Mr. Miller, the special mining deputy, whose duty it was to make a special investigation of the mine before the permit could be issued. (Stats. 1917, p. 682.) Mr. Miller, at the time the application was presented to the branch office in San Francisco, was in Sacramento, and, therefore, the application was forwarded by the deputy commissioner in San Francisco to

Sacramento for filing in the main office and it was so marked as having been finally filed in the main office at Sacramento. We need not decide what the legal situation would be if Mr. Miller had been present in the San Francisco office when the application was presented and had considered the matter of the application then and there and thereupon had made and issued his approval without the application having been filed in the Sacramento office. Suffice it to say, for the purpose of a discussion and a decision of this case, that the application was ultimately caused to be filed in the Sacramento office. In other words, even though the application may be treated as having been filed first in the San Francisco office, nevertheless the fact remains that it was ultimately and properly filed and caused to be filed by the defendant in the Sacramento office at which office it was examined and considered. Section 781 of the Penal Code provides that, "When a public offense is committed in part in one county and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more counties, the jurisdiction is in either county." This section, we think, governs and controls the situation presented in the instant case. The filing of the application in question, although initiated in the branch office at San Francisco, not having been completed until it was filed in the main office at Sacramento, there is no escape from the conclusion, it seems to us, that when the defendant presented the application to the deputy in the branch office at San Francisco for filing his liability in the matter did not stop there for the reason that by his act of presenting the application to the deputy in control of the branch office in San Francisco he caused the deputy in the course of the performance of his duty to forward the application for filing to the general office at Sacramento. This being so, the defendant was properly prosecuted in Sacramento county where the crime was in part committed and ultimately consummated.

[3] It is the claim of the defendant here, and it was his defense in the court below, that the application in question, when read and considered in its entirety, was not intended to be understood as containing a representation that the defendant had made the mine pay $7,000 net per month for the entire period of the three years, "1900–1 and 2."

The alleged false statement was contained in a letter written by the defendant addressed to an attorney for the Alpha Quicksilver Company, which letter was incorporated by the defendant in and made a part of the application for the desired permit. The letter contained a general history of the mine, including a history of the various transfers of title and a general history of the production of said mine for a period of twenty years prior to the filing of the application. It also set forth a description of all of the land which would be bound by the issuance of the securities, for which application was made. The following are the paragraphs containing specific reference to the profits of the mine and which bear on the alleged false statement. "In the winter of 1898–99, this mine was acquired by R. A. Boggess, and associates and over $200,000.00 spent in equipping and developing it. Boggess had sole charge of all the construction and development, and in 1900 put it on a net paying basis of over $7,000.00 per month. This mine sold for one million dollars in 1901, $200,000 being paid on account. It was then clearing seven thousand dollars ($7,000.00) net per month over all operating expenses. (Supreme Court Records of California prove this fact.) During this period quicksilver averaged $45.00 per flask. The ores at that time were treated in a Scott furnace of a daily capacity of 40 tons." The final paragraph of the letter which contains the statement charged in the amended information to be a false statement is as follows:

"*During the time Boggess had absolute charge of the operations at the mine in 1900–1 and 2, he made it pay net over $7000.00 per month—NET over all mine operating expenses, quicksilver selling at an average of $45.00 per flask.* He is so absolutely confident with the proper funds required, as indicated herein, and at prevailing prices for quicksilver, and without interference with his management at the mine, he can make it pay from $12,000.00 to $15,000.00 Net per month for ten to fifteen years."

It was the defendant's defense that the only period of time intended to be covered by the statement alleged to be false was that particular period of time in which he was in absolute charge of the mine. In this behalf it is argued that while the particular statement alleged to be false, standing alone, is perhaps susceptible to the construction

that the defendant was in absolute charge of the mine during the entire period of the years "1900–1 and 2," nevertheless in determining the scope and effect of the statement alleged to be false, resort may not be had only to the language of the particular statement, separated from and without regard to the context of the entire application in which said statement was embodied. The meaning of the alleged false statement, it is argued, can be ascertained only by construing it in conjunction with other statements and declarations contained in the application which may be properly said to be related to and connected with the particular alleged false statement. So construed it is insisted that the application as a whole shows, not that the defendant was in absolute charge of the mine throughout the entire time of the specified years, but that he was in such absolute charge only during a portion of those years. In this behalf attention is directed to a consideration of those other portions of the application wherein the defendant stated that "in" the year 1898–99, when the mine was acquired by him, he had sole charge of the "construction and development" work and "in 1900" he put it on a net paying basis of $7,000 net per month. Of course, the words and phrases employed in the statement, in its entirety, must be taken in their ordinary meaning and so taken the word "in," as used in the application with reference to the operation of the mine in the year 1900, may be said to indicate "inclusion within the limits of the time expressed . . . 'In' is . . . common in the sense of 'during the course of.'" (Webster's New International Dictionary.) Therefore, that portion of the application may be read and understood as meaning that he put the mine on a net paying basis of $7,000 per month some time during the course of the year 1900 rather than during the entire period of that year.

In support of the contention immediately under consideration reference is also made to another statement contained in the application that the mine was sold in 1901 to a New York syndicate. From this it is argued that the application shows that the defendant was not in absolute charge of the mine at any time in the year 1902, nor after the sale of the mine to the syndicate in 1901, until the year 1916, "when," as the application reads, "the present owners acquired it." It is insisted that the two statements last above referred to,

preceding, as they do, and being closely connected with the subject matter of the alleged false statement tended to clarify the ambiguity, if any, of said statement, and, therefore, may be rightly resorted to as a mark and measure of the particular time when the defendant was in absolute charge of the mine.

Incidentally it may not be amiss to say at this point that the defendant testified at the trial that he was in absolute charge of the mine only from September, 1900, to May, 1901, and that he did not have "absolute charge" in any part of the year 1902 and that the reference in the alleged false statement to the year 1902 was a typographical error which was the result of a misunderstanding of the stenographer to whom the application was dictated amid the noise and confusion of a hotel lobby. This, of course, was a question for the jury to determine, but it should be noted that the application itself shows other admitted typographical errors in the statement of material dates which escaped correction. Thus, it appears that the real date of the application was January 20, 1920, but the typist typed it 1919. Another obvious typographical error appears elsewhere in the application where "1919" was typed instead of the year 1917.

We are not to be understood in this discussion of the defendant's defense as holding that his construction of the application, as above outlined, is correct nor that his testimony concerning typographical errors in the application should have been accepted by the jury. Our reference to this phase of the case is purely for the purpose of illuminating the remaining points presented in support of a reversal of the judgment which will be discussed later in this opinion.

It was the theory of the prosecution that the alleged false statement was intended to cover every month during the three years referred to in the application. No evidence was offered by the prosecution tending to show specifically what the actual production of the mine was during any one month of those years. The case of the prosecution consisted largely, if not entirely, of evidence as to what was the yearly production of the mine from which its monthly production was arrived at by dividing the total production of the year by the number of months in the year. Part of the evidence of the prosecution as to the production of the mine was

embodied in a bulletin of the state mining bureau containing statistics showing the quicksilver production of the state as a whole for the years 1900, 1901 and 1902, together with statistics of the quicksilver production of the individual counties in those years. The production shown by these statistics was a yearly production and not the production per month. The evidence shows that the statistics in this bulletin were compiled from the reports of the various mine owners for each year as to the quantity and value of the production. The statistics for Lake County, where the mine in question is located, shows a production in 1900 of 3,165 flasks, valued at $127,345; in 1901 of 4,395 flasks, valued at $211,324, and in 1902 of 3,611 flasks, valued at $161,568. These statistics did not purport to show the individual production of any mine situated in Lake County. It was shown in evidence, however, that the statistics in this bulletin were based in part upon a report sent in by the defendant as to the production of the mine in question in the years 1900 and 1901. This report showed a production of the mine in question for the entire year 1900 to be 1,300 flasks without stating the value thereof. It was the defendant's claim that in the early part of the year 1900 while he was using an eight-ton furnace the production was, on account of the limited capacity of the furnace, much lower than at a later period of the same year, when he was using a forty-ton furnace, and that he put the mine upon a net paying basis of $7,000 net per month after the installation of the larger furnace in September, 1900. The report for the year 1901, during which time the larger furnace was in operation, shows a production of 2,000 flasks worth $100,000.

There is evidence in the record, elicited by the testimony of a Mr. Roeth, a witness for the defendant, showing the amount of quicksilver handled for the mine in question during several of the months in which the defendant had absolute charge of the mine, by a quicksilver selling company, known as the Eureka Company, which bought and sold quicksilver from all the quicksilver mines in California. This is the only direct evidence as to the production of the mine in question for any one month. This evidence, covering, as it did, practically the period of time in which the defendant was in absolute charge of the mine, shows the

production of the mine after the installation of the forty-ton furnace to have been as follows: In 1900: November, 273 flasks; December, 304 flasks; in 1901: January, 257 flasks; February, 265 flasks; March, 255 flasks, and May, 188 flasks. This testimony, coupled with defendant's testimony that the cost of production was $10 to $12 per flask and the admitted fact that quicksilver was selling at the time in question at $45 per flask, shows a net profit of $7,000 or more for several of the months during the period stated. And a showing of the same profit would also result if in lieu of the defendant's estimated cost of production per flask resort is had to his general estimate of the operating expenses of the mine, as testified to by him, or from $3,000 to $4,000 per month. This is so because during the several months referred to there was produced at the mine the sum total of 1,542 flasks of quicksilver which, at a selling price of $45 per flask, would make a gross return of $69,309, and deducting from this the sum of $24,000, the operating expenses estimated at $4,000 per month for a period of six months, a net profit is left of $45,390 for the period of six months, or an average net profit of $7,565 per month.

In corroboration of this claimed production from September, 1900, to May, 1901, there is the testimony of the defendant's witness O'Bryant, who hauled the quicksilver from the mine for shipping during that period, to the effect that he hauled on an average of 280 to 300 flasks per month. It is to be noted that the testimony of this witness covers practically the period of time during which the defendant claims to have been in absolute charge of the mine. The testimony of another witness for the defendant, one Buchanan, tended to corroborate O'Bryant's testimony. So, also, did the testimony of one Dunfield, a witness for the defendant, who was in charge of the condenser at the mine in question for five or six months commencing in the fall of 1900. This witness further testified that there was an enormous big run of quicksilver during the time he was there, which times coincides with the time in which the defendant claimed that he was in absolute charge of the mine. There is other evidence in the case that in 1901 the mine in question disclosed a formation which indicated a considerable amount of valuable quicksilver ore.

The evidence offered by the prosecution as to the cost of the production of quicksilver at the mine in question, which, of course, was necessary in order to determine the net profit, consisted in a large measure of general estimates to the effect that the average cost of production was about $30 per flask, throughout the quicksilver mines of the state, but this evidence did not relate to nor purport to bear directly upon the actual cost of labor, fuel, and other operating expenses of the mine in question. It was an undisputed fact in the case that the cost of quicksilver production varies greatly at different mines throughout the state and to such an extent that the cost of production at one mine may be twice as great as at another mine. True, there is other evidence, consisting of general estimates of the cost of production at the mine in question, based upon the probable number of men employed, the probable amount of cordage consumed as fuel, and a general assumption of a sum of money to be added for necessary development work. But it was shown by the testimony of several witnesses, testifying without contradiction upon behalf of the defendant, that the actual number of cords of wood consumed as fuel in the production of quicksilver at the mine in question from September, 1900, to May, 1901, was only two cords per day, which amount is only one-third of the number of cords estimated by the witnesses for the prosecution to be necessary to the operation of the furnace. There is also evidence, uncontradicted, on behalf of the defendant that many of the men employed at the mine received but $2.50 per day, whereas the prosecution's witness estimated the probable cost of labor at the mine at $3 per day for all of the men employed. There was further evidence to the effect that the mine was comparatively dry, very little timbering was necessary, and that it was favorably located for cheap mining in that it was not far removed from rail transportation; that wood for fuel grew in abundance and that there was plenty of water for domestic purposes, steam, etc.

Upon behalf of the defendant there was offered and received in evidence an excerpt from "Mineral Resources of the U. S., Department of Interior, U. S. Geological Survey," which stated that "under ordinary circumstances quicksilver could be produced in California at a cost of $3.00 per ton of ore mined and smelted." And the defendant himself

testified that the maximum cost of producing quicksilver at the mine in question, under the conditions existing there, was $3 per ton of ore and that the cost of production per flask of quicksilver was but from $10 to $12 per flask.

In short there is direct and positive evidence in the record adduced upon behalf of the defendant tending to show that during several months of the years designated in the application the mine did actually pay over $7,000 net per month over operating expenses. On the other hand, there is evidence consisting of general estimates tending to show that during the said years the mine did not pay $7,000 net per month. It is apparent from a perusal of the evidence adduced upon the entire case that the guilt or innocence of the defendant hinged upon the solution of a perplexing problem which necessarily depended in a large measure upon a close consideration of a hypothetical situation developed by the evidence of the prosecution as against an actual situation developed by the direct evidence of the defense.

We are not unmindful of the rule that if there be any substantial evidence in the record tending to support a verdict, the judgment based thereon should be sustained. And had the record before us disclosed no errors or irregularities occurring during the course of the trial operating to the prejudice of the defendant to the extent that in all likelihood they contributed to the verdict, we might in the instant case be constrained to hold that the evidence adduced upon the entire case suffices to support the verdict. We are also not unmindful of the fact that judgments in criminal cases have been affirmed in spite of serious errors and irregularities occurring during the course of the trial, but in those cases the errors and irregularities were evidently the result of inadvertence, and the evidence of the guilt of the defendant so overwhelming that it could not be said that the result of the jury's deliberations would have been different had not the errors and irregularities intervened. On the other hand, there are cases in the books similar to the one at bar, where the evidence of the defendant's guilt was not overwhelming, which were reversed because of pronounced, persistent and pernicious misconduct during the course of the trial, which obviously intervened to deprive the defendant of a fair and impartial trial and which warranted the con-

clusion that if the case had been fairly tried the result may well have been different. (See *People v. Edgar*, 34 Cal. App. 459 [167 Pac. 89.] The case as presented by the prosecution is not so overwhelming as to compel the conclusion that the verdict of the jury would have been the same regardless of the errors and irregularities urged in support of a reversal. We are satisfied from a close consideration of the evidence *pro* and *con* that the said errors and irregularities tended to the prejudice of the defendant and the defendant's case to such an extent that they proved an important factor in the determination by the jury of the guilt of the defendant.

Numerous specifications of errors in the rulings of the trial court relating to the reception of evidence offered on behalf of the prosecution and the rejection of evidence offered on behalf of the defense are urged in support of a reversal of the judgment. In some instances the objections interposed by the defense were not well taken. These particular objections need not be discussed.

[4] Apparently it was the theory of the defense in part that the relative cost of treating high-grade ore was less than the cost of treating low-grade ore. In other words, the richer the ore the lower would be cost of production per flask, and conversely, of course, the lower the grade of ore the higher the cost of production. There is evidence in the case tending to show that the mine in question was a "high-grade ore" mine, and in keeping with the theory of the defense there was propounded to one of the witnesses the question, "From your experience, would you say it would cost any more per ton to treat low-grade ore or high-grade ore?" This question was objected to upon the ground that "the witness is not qualified as an expert, and secondly, that according to his own testimony his experience is confined largely to one mine." It was not necessary, in order to render this witness' testimony admissible, that he should qualify as an expert in the strict sense of the term. [5] It is the generally recognized rule that the opinions of non-expert witnesses are admissible upon a great variety of unscientific questions arising every day and in every judicial inquiry. These opinions are not admitted in evidence as testimony of experts, strictly so called, but rather upon the theory that they depend upon knowledge which anyone may

acquire but which the jury may not have and are the most satisfactory and oftentimes the only obtainable evidence of the fact to be proved. [6] Opinion evidence is that which is given by a person of ordinary capacity who has by opportunity acquired a particular knowledge which is outside the limits of common observation and which may be of value in elucidating a matter under consideration. Accordingly it is the rule that the opinions of nonexpert witnesses may be received in evidence when the witnesses have by their experience gained an acquaintance with a particular subject matter not common to others and which may aid the jury in coming to a conclusion. [7] And if a witness has had ample opportunity of acquiring particular knowledge with reference to a particular process employed in a particular business his opinion is not to be rejected because perchance he may be engaged in several other separate and distinct occupations, nor is his opinion to be rejected even though it is based upon observation and experience acquired in the operation generally of a business rather than in the detailed operation of that business.

Doubtless if an answer to the question objected to had been permitted it would have been followed by other interrogatories which would have elicited the difference in the cost of the treatment of the different grades of ore. The trial court, however, sustained the objection upon the ground that "unless he [the witness] says he has some knowledge of the cost of production—of what the cost of production was at the Abbott mine, [the mine in question] his testimony would be immaterial." Clearly the question objected to was not directed to the cost of production at the mine in question, but related solely to the question as to what was the difference in the cost of the production of high grade and low grade ore, and therefore the ruling of the trial court was made and based upon a ground which was clearly at cross-purposes with the fact sought to be elicited by the question. [8] The ruling of the trial court was tantamount to a declaration that, regardless of the qualification of the witness to give his opinion concerning the fact involved in the question objected to, he would not be permitted to testify unless it were shown that his opinion was based upon his knowledge and observation of the situation existing at the mine in question. It is obvious, therefore, that no

matter what the qualification of the witness may have been, the trial court would not, under its ruling, have permitted him to testify. It therefore cannot be correctly said, we think, that the trial court gave a wrong reason for a correct ruling. Clearly, the ruling and the reason for the ruling were wrong.

The record shows, upon this phase of the case, that the witness, in addition to being engaged in various commercial enterprises, was also the principal owner of a quicksilver mine in California which, although now dormant, he "run with other parties since 1887." To "run" means "to conduct; manage; carry on" (Webster's New International Dictionary). In addition to his intimate association with the operation of that mine the witness had occasion to investigate and inspect a great many other quicksilver mines. He testified he "would look at . . . and class them" with his mine "from that time on." This witness was also a member of the Eureka Company, a corporation composed of all the quicksilver mines of the state, including the mine in question, which was organized for the purpose of selling the output of the quicksilver mines of the state and keeping up the price of their products. His experience, we think, was sufficient to show that he was possessed of knowledge, based upon observation and experience, of the fact sought to be elicited by the question objected to, and, therefore, a proper and sufficient foundation was laid for the introduction of his testimony. Such a foundation having thus been laid he should have been permitted to answer the question.

[9] We are not prepared to say that the difference in the cost of treating high and low grade ore is a matter of such common knowledge that the jury might well be assumed to know what that difference was without receiving evidence upon the subject.

While it is true that the defendant himself testified as to the relative cost of treating high grade and low grade ore, still the defendant's testimony was so radically discredited by the personal interposition of the trial judge as to seriously impair if not utterly destroy its value as evidence. And in such a situation the refusal to receive in evidence the testimony of a disinterested witness concerning that subject matter clearly redounded to the disadvantage of the defendant.

[10]   The prosecution was permitted to have in evidence over the objection of the defendant a copy of the minutes of the organization meeting of the Alpha Quicksilver Company, which was operating the mine in question, dated March 27, 1917.   The objection was that such minutes were irrelevant, immaterial, and incompetent and did not pertain to any of the issues of the case.   A reading of these minutes shows that they are immaterial and irrelevant to the issue raised by the plea of "not guilty," in that they did not show or tend to show the falsity of the statement upon which the defendant was informed against or that he knew or had reason to believe that said statement was false.   The purpose of the introduction of these minutes is not apparent. Its tendency was to encumber the record, confuse the jury and cloud the issue by conveying to the jury, by innuendo, the thought that the defendant was unlawfully engaged in some manner in manipulating the stock and property of said Alpha Quicksilver Company.   The defendant, however, was not charged with any fraud in connection with his dealings with the Alpha Quicksilver Company, and the minutes in question, failing to throw any light upon the truth or falsity of the statement upon which the defendant was informed against, should have been rejected.   We are unable to find anything in these minutes which warrant the contention that the defendant represented at that meeting that the Abbott mine was actually worth in excess of $750,000.   These minutes merely show that the Alpha Quicksilver Mining Company was to be organized with a capital stock of $750,- 000, to be divided into 150,000 shares of the par value of $5 each.   And while there is evidence that the defendant did deraign title, prior to the organization meeting, through the medium of a sheriff's deed for the sum of $6,500, nevertheless it is not disputed that, as testified to by the defendant, some $200,000 had been expended by the defendant and others associated with him in the promotion of the mine for the operation, development and equipment of the mine.   In the situation thus presented we are unable to perceive how it can be said that the minutes in question showed or tended to show any representation, false or otherwise, which had any material bearing upon the alleged false representation for which the defendant was tried and convicted.   [11]   It is argued in support of the ruling of the trial court that

inasmuch as these minutes did, incidentally, show that the defendant was an officer and agent of the Alpha Quicksilver Company, they were relevant to that portion of the information which charged him with being such an officer, and that, therefore, a general objection which went to the irrelevancy and immateriality of the said minutes was properly overruled. It was an established and undisputed fact in the case that the defendant was an officer of said Alpha Quicksilver Company, and plainly the objection to the minutes was not directed to the fact that they showed the defendant was an official of said quicksilver company, and it appears just as plainly that the objection was directed to the exclusion of the text of the minutes which bore upon immaterial matters and which might be used in the argument to the jury to the prejudice of the defendant. **[12]** While it is true ordinarily that an objection to evidence must be sufficiently specific to inform the court of the scope of the objection, nevertheless, where the record shows, as it does in the instant case, that all the parties, including the court, must have understood the purpose of the objection, it will not be said that the objection failed of its purpose. (*People* v. *Shattuck,* 109 Cal. 673 [42 Pac. 315]; *People* v. *Yee Fook Din,* 106 Cal. 163 [39 Pac. 530].)

Moreover, the record shows that after the minutes in question were offered and marked for identification the district attorney announced that he offered "such portions thereof" as he had marked with a blue pencil, which he desired to thereafter read in evidence. Thereupon counsel for the defendant again interposed the objection that the reading of those portions of the minutes was "incompetent, irrelevant, and immaterial and not pertaining to the issues of the case." This objection was also overruled. Surely this objection was sufficiently specific to direct the court's attention to the many immaterial matters embodied in the minutes in question.

**[13]** The prosecution, in an endeavor to show that the defendant knew that his statement that he had made the mine pay a certain specified sum in the years 1900-1 and 2, was false, offered and succeeded in having received in evidence a report made to and filed with the superior court of Lake County, February 19, 1904, by the defendant, as receiver of the mine in question. This particular piece of

evidence was objected to upon the ground that it was imma-
terial, in that it did not purport to represent the condition
and operation of the mine during the years mentioned in
the alleged false statement. Responding to the objection
thus made the district attorney declared that the report ''goes
to show that the defendant at the time he made the applica-
tion to the commissioner of corporation knew—it is a ques-
tion of the knowledge of the defendant.'' The trial court,
after examining the report, overruled the objection and
ordered that the evidence ''be admitted for the purpose of
showing knowledge, if any, on the part of the defendant.''
We fail to find anything in that report which shows or tends
to show that the defendant knew or must have known that
his statement that he had placed the mine, when under his
absolute control in the years 1900–1 and 2, upon a paying
basis of $7,000 net per month, was false. The report in
effect shows, as declared in the application filed by the
defendant with the corporation commissioner, that after the
mine was sold to a New York syndicate dissension arose
among the new owners which in the year 1903 resulted in
litigation; that the operation and output of the mine was at
a very low ebb during a portion of that particular year be-
cause of the fact, among other things, that the mine was
being operated only for the purposes of a ''clean-up'' which
is made by means of closing down the furnace, cooling the
same and cleaning the flues and condensers, and the fact
that the ore at hand which was being used in the process
of the ''clean-up'' was found not to possess the richness of
the ore developed prior to that year; and that ''all of the
bodies'' of ore which had been theretofore ''blocked out for
extraction and reduction had become exhausted'' and that
practically no ore of commercial value remained *''devel-
oped''* in the mine. [Italics ours.] Of course the report
was evidence of the fact that the mine under the conditions
narrated in the report was being operated at a great loss
during the latter portion of the year 1903. And if the re-
port had shown the operating conditions to be the same dur-
ing that portion of the year of 1903 as they were in 1900–1
and 2, then it might well be said that the defendant must
have known that the mine could not have been made to pay
$7,000 net per month in the three years last mentioned and
that, therefore, he knew that his statement in that particu-

lar was false. But it cannot be said in the absence of a showing of similar operating conditions—and the report shows upon its face that the conditions were different—that the ad-' mission by the defendant in the report in question to the effect that the mine was a liability rather than an asset in the year 1903, showed that the defendant knew that the mine was being operated at a loss rather than a profit in the years 1900–1 and 2. The admission in evidence of the report in question, for the purpose stated, was error and doubtless redounded to the prejudice of the defendant.

[14] A witness for the prosecution was permitted to testify as to the low percentage of quicksilver extracted from the tonnage mined at the mine in question in the years 1916 and 1917, which percentage he learned upon an examination of the mine made in the year 1919. Counsel for the defendant first objected to the testimony sought to be elicited from this witness upon the specific ground that it was incompetent, irrelevant and immaterial, "not pertaining to the issues in this case," "as hearsay," that the examination was not made at the request of the defendant and that it was "too remote." This particular objection the trial court overruled upon the ground that "it didn't necessarily have to be at the request of the defendant. If a man finds a state of affairs existing there it may have been as the defendant represented to the state or he may have found different conditions." Counsel for the defendant then interposed the further objection that "the examination is not confined to the time; should be limited to the time alleged in this information." This objection was overruled. In support of these rulings it is insisted that the only objection made to this particular testimony worthy of consideration was that which went to its remoteness and it is argued that the testimony in question, even though it related to a time some sixteen years subsequent to the time mentioned in the alleged false statement, was not too remote. With this contention we cannot agree. Although the objection as made did not in terms specify as one of its grounds that no showing was made that the conditions at the mine were the same in 1919, when the witness examined it, as they were in the years 1900–1 and 2, nevertheless, the objection as made apparently was sufficient to direct the trial court's mind to the necessity of such a showing, for the court in one of its

rulings upon the objection indicated clearly enough that the admissibility of the evidence depended upon a showing of the existence of similar conditions. And clearly, unless it were shown that the result of the examination of the mine by the witness was based upon similar existing conditions, it could not have been material or relevant to the issue involved in the instant case. The objection that the evidence tended to show a situation too remote from the time involved in the alleged false statement was, we think, well taken and should have been sustained. [15] True, there is no hard-and-fast rule relative to the admission of evidence claimed to be too remote. Ordinarily an objection to remoteness of evidence goes to the weight of the evidence but there may be instances in which the remoteness° will be so great as to render the proffered evidence utterly unsatisfactory and immaterial. This must depend largely upon the circumstances of each particular case and as the law does not fix any particular limitation of time which will render evidence too remote, the admissibility of evidence in the face of objection upon the ground of its remoteness ordinarily should be left to the sound discretion of the trial court. (*Estate of Akers,* 184 Cal. 514 [194 Pac. 706]; *Coates* v. *Sulau,* 46 Kan. 341 [26 Pac. 720]; *Snow* v. *Grace,* 29 Ark. 131; *Holliday Bros.* v. *Cohen,* 34 Ark. 707; *Cline* v. *State,* 51 Ark. 140 [10 S. W. 225].) [16] But in view of the fact that the evidence complained of related to a situation existing some sixteen years subsequent to the time mentioned in the alleged false statement and that no showing was made that the existing conditions upon which the evidence was based were identical with or substantially similar to the conditions existing some sixteen years before, it must be held that it was an abuse of discretion for the trial court to admit the evidence complained of and there can be no doubt but that such evidence tended to the prejudice of the defendant.

It is suggested that "the case presented by the prosecution was undoubtedly legally sufficient to support a verdict of conviction. The case thus made by the prosecution was strengthened rather than weakened by the evidence produced by the defendant and especially by the cross-examination of the defendant himself." In support of this suggestion excerpts from the defendant's testimony are referred to and reference is also made to other evidence which, it is

claimed, is in itself sufficient to compel and confirm the conclusion of the guilt of the defendant. We are not satisfied that this is so and, therefore, feel constrained to comment upon those portions of the evidence which are relied upon to support the suggestion. Thus we are unable to concur in the contention that the defendant upon cross-examination was compelled to admit the falsity of the statement contained in the application to the commissioner of corporations that $200,000 was paid by the Empire Consolidated Quicksilver Mining Company on account when the mine was sold in 1901 by the Empire Quicksilver Mining Company. The record, as we read it, shows in this particular that the defendant, upon his cross-examination, testified substantially that $200,000 was paid by the Empire Consolidated Quicksilver Mining Company to the Empire Quicksilver Mining Company for the mine in question, but that out of this money there was paid by the Empire Quicksilver Mining Company to the Abbott Quicksilver Mining Company of Illinois, predecessor in interest of the Empire Quicksilver Mining Company, the sum of $86,000 and that in addition a bond issue of $60,000 of the Abbott Quicksilver Mining Company of Illinois was assumed by the Empire Quicksilver Mining Company. The fact that the Empire Quicksilver Mining Company paid $86,000 and assumed a bond issue of $60,000 does not show that the Empire Quicksilver Mining Company did not receive $200,000 from the Empire Consolidated Quicksilver Mining Company, as claimed by the defendant in his application.

Nor can we concur in the contention that the defendant was compelled to admit that the statement in his application that "the Supreme Court Records of California prove this fact"—referring to the fact that the mine paid $7,000 net per month—was false. The defendant explained that when he made the statement in his application he was referring to the briefs filed in the supreme court in the case of *Continental Building & Loan Assn.* v. *Boggess.* A perusal of Exhibit "R," attached to the application to the commissioner of corporations, which contains excerpts from the briefs in the case referred to shows that the defendant had in mind, when referring to the records of the supreme court, that the briefs of the attorneys in the case constituted a part of that record. Those briefs contained the statement that

the mine was making $7,000 net per month, and they being the record to which the defendant doubtless referred in the application, it cannot be fairly said that his statement of what the record showed was willfully false.

As we read and understand the record it does not show that the defendant declared under oath in the case of *Continental Building & Loan Assn.* v. *Boggess* that the profits of the mine from November, 1900, to May, 1901, amounted only to about $32,000. True, he did say that "the profits" of the mine went into the hands of Mr. Corbin as treasurer of the company and that "these profits" amounted to about $32,000 over the actual operating expenses from November to May. But he explained further that this particular $32,000 was the residue of the profits of the mine which actually came into the hands of Mr. Corbin as treasurer after there had been dispersed to other persons a sum aggregating $22,000, which would make a sum total of $54,000, and figure a net profit of over $7,000 per month.

It is asserted that the defendant made three different written statements as to the amount spent in reopening the mine in 1916 and 1917, in one of which he placed it at $135,000, in another of which he placed it at $165,000, and in the third at $60,000, and he testified on the stand that he thought it was close to $100,000. A close consideration of the evidence upon this phase of the case shows that the defendant when referring to the $165,000 was referring to the amount of money spent in regaining title to the mine and not to the amount of money expended in re-equipping the mine, which obviously are totally different expenditures, and that when referring to the $60,000 he had in mind the amount of money expended in 1916 only. The only discrepancy, therefore, is between the $135,000 and the $100,000 and, inasmuch as the $100,000 referred to the amount of actual cash expended and the $135,000 included the interest on the money expended, it cannot be said that there was any substantial variation in the defendant's statements as to the amount expended in reopening the mine.

It is contended that the evidence shows that the defendant "had endeavored to induce William Forstner, a mining expert, to make a false report on this mine for use in connection with the defendant's application to the corporation commissioner." The record in this behalf shows no more

than that the defendant did forward to Forstner, who had previously made an investigation of the mine, a statement concerning the geological formation of the mine, its condition and the cost of its operation and development. Forstner did not adopt the statement furnished him by the defendant in its entirety, but amended it in some particulars to conform to his observation and opinion of the mine, but in most particulars the report conformed with the statement furnished by the defendant, and in one instance was more favorable than the original statement of the defendant. The difference between the statement submitted by the defendant and the report of Forstner rested upon a difference of opinion existing between Forstner and the defendant as to the cost of production and an estimate of the cost of needed repairs to the mine. A perusal of the letter to Forstner indicates that the defendant intended that Forstner should rely upon his own judgment in making his report rather than upon the particulars of the statement furnished to him. It shows, in one instance at least, that Forstner was to make his choice of one of two statements. Forstner forwarded the statement as modified to the defendant, who filed it as modified with his application to the corporation commissioner.

We do not understand that the defendant in a letter written by him in 1918 to one Theo Smith and offered and received in evidence upon behalf of the prosecution "represented that the mine cleared a net average of $7000.00 per month until 1904." This letter reads, "A reduction plant installed 1900, was then operated with this plant until 1904. It cleared net over all operating expenses an average of $7000.00 per month." This statement did not necessarily mean that the mine averaged that amount continuously until it was closed down in 1904, and when read and considered in conjunction with other evidence adduced upon behalf of the prosecution it cannot be said that the statement in question was radically and willfully false. There is testimony in the case of the prosecution to the effect that the mine produced approximately 200 flasks of quicksilver as the clean-up of March of 1903, which at the defendant's estimated cost of production, would show a profit of $6,600 for that month. There is also evidence introduced by the prosecution that 192 flasks per month were produced by the mine during all of 1902 and part of 1903, which would

show a net profit of $6,336 per month. There is in addition other evidence, as previously indicated, which shows that during several months of the time included in those years the mine produced *over* $7,000 per month.

It is true that the defendant in a letter to Theo Smith did state that "twelve years' time and over $1,000,000.00 in cash were spent by the interests I represented in regaining title to the mine." The defendant admitted that this statement was not correct and in explanation thereof stated that it was a typographical error and in support of this contention cites the obvious and undisputed fact that in the same letter "$20.00 a month" was erroneous and should have been written $20,000 a month. If it be conceded that the subject matter of this letter was material to the issue of the defendant's guilt of the charge for which he was informed against, still assuming the statement in question to be false, that fact alone would not suffice to warrant the jury in finding the defendant guilty as charged and while it might be resorted to in conjunction with the evidence adduced upon the entire case, the defendant was entitled to have it go to the jury free and clear of the many immaterial and prejudicial matters which were erroneously admitted in evidence. In short, we are not prepared to say that the jury, in the face of evidence which tended strongly to support the defendant's claim that while he was in absolute charge of the mine, the mine did pay on an average of over $7,000 net per month, would have found the defendant guilty as charged merely because of the fact that he had made a misstatement as to the amount of money expended in regaining title to the mine.

[17] Complaint is seriously and properly made of the misconduct of the trial judge occurring during the trial of the case. In the preliminary report of the defendant as receiver of the mine in question was contained the following statement: "During the month of September, 1903, 31 flasks of quicksilver were shipped to Langley-Michaels Company. Referring to the August report, error was made in the last paragraph in stating that no quicksilver was shipped in that month. As a matter of fact 65 flasks were shipped during that month and duly accounted for in the August report under the head of 'Cash Received $2600.00, being

an advance of $45.00 per flask on the 65 flasks.' '' When this portion of the report of the receiver was read to the jury the court interrupted and, as the record shows, "speaking to the jurors," said, "Do you understand that it says that during August there were 65 flasks shipped, but that they had erroneously stated that no quicksilver had been shipped in that month—failed to report that amount; and it stated that there was 65 flasks shipped in the month of August, and 31 in the month of September?" Manifestly, the report spoke for itself and, if it were properly receivable in evidence, should have been submitted to the jury without any comment from the court which tended to accentuate any particular portion thereof and it would seem that the purpose of the interruption and comment of the court was to emphasize the fact that the defendant had made a false statement in his August report and was endeavoring to avoid the effect of that misstatement by the latter report. The remarks of the trial court in this particular instance constituted a comment upon a particular piece of evidence in the case which doubtless tended to lead the jury to believe that the court was suspicious of the defendant and naturally must have been understood by the jury as an argument against the defendant. This the court was not privileged to do. (*People* v. *Adams*, 143 Cal. 208, 213 [101 Am. St. Rep. 92, 66 L. R. A. 247, 76 Pac. 954]; *People* v. *Patterson*, 124 Cal. 102, 105 [56 Pac. 882]; *Thomas* v. *Gates*, 126 Cal. 1, 4, 5 [58 Pac. 315]; *People* v. *Gordan*, 103 Cal. 568, 576 [37 Pac. 534]; *People* v. *Lonnen*, 139 Cal. 634, 637 [73 Pac. 586].)

Frequently throughout the course of the trial, without apparent need, the trial court interrupted the examination of the defendant, when testifying as a witness in his own behalf, to the extent of practically taking the examination of the defendant out of the hands of his counsel, and indulged in an extensive course of examination and cross-examination of his own. This was done despite the objection of the attorney for the defendant, the trial court giving as a reason when overruling one of the objections that "the Court is trying to facilitate the examination. He is trying to figure it from the blackboard, and if he knows I want him to tell the jury, and if he doesn't know, I want to find out." Con-

ceding that there may have been times during the cross-examination of the witness by the district attorney when it seemed that the defendant was evasive and nonresponsive in his answers and that in such a situation the trial court may have been justified in endeavoring to elicit direct answers to the questions propounded, still that situation did not obtain during the direct examination of the defendant by his own counsel, and so far as we are able to glean from the record there was no need for the intervention of the trial court.

[18] There can be no doubt that it is the duty of the trial court, if the exigencies of the occasion require it, to facilitate, by one or more proper interrogatories, the direct and cross-examination of a witness. But for the court to repeatedly take the defendant as a witness out of the hands of his counsel who, as the record before us shows, was apparently competent, conscientious, and expeditious in his conduct of the case, and proceed along an independent and extensive line of examination and cross-examination is not only not commendable but highly irregular and for the sake of due and orderly administration of justice should not be indulged in. Ordinarily the proper course, and the one generally pursued, is to allow the examination by counsel—direct, cross, redirect and recross—to conclude, and then if anything in the judgment of the trial court remains obscure, which may be material for the jury to know, and it seems desirable that an examination of the witness should be further pressed, then, with perfect propriety, the trial court may, and, indeed, should, intervene so that the ends of justice may be subserved. This, however, should be done with care, particularly where the witness is the defendant in the case, lest the jury should, because of the court's intervention, and because of that fact alone, indulge in adverse inferences and conclusions from the testimony of the witness.

In view of the situation of the evidence in the instant case, considered with reference to the erroneous rulings hereinbefore referred to, and the adverse impressions which the jury undoubtedly received from the court's intervention in the examination of witnesses in the manner indicated, we are of the opinion that said rulings and intervention, taken

together, contributed materially to the conclusion reached by the jury.

Judgment is reversed.

Lawlor, J., Seawell, J., Richards, J., and Shenk, J., concurred.

MYERS, C. J., Dissenting.—I dissent.

I concur with the conclusions of the majority opinion that the information herein states facts sufficient to constitute a public offense; that the same was properly triable in the superior court of Sacramento County, and that the evidence is legally sufficient to sustain the verdict of conviction. But I do not think that any error was committed at the trial to the substantial prejudice of the defendant. The opinion evidence offered by the defendant to prove that the cost of producing quicksilver from high-grade ore was relatively less than in the case of low-grade ore was, in my opinion, properly excluded, because the witness was not shown to have had any special knowledge or experience in the treatment of the two grades of ore. Moreover, assuming that this ruling was erroneous I do not think that it could have prejudiced the defendant, because any intelligent juror would reason that if the cost of producing quicksilver was $3 per ton of ore, the relative cost of production would be less in the case of high-grade ore which produces more quicksilver per ton, and the same reasoning would apply equally to any other assumed figure as the cost per ton of ore. I do not think that the trial court erred in admitting in evidence, over the objection of the defendant, the minutes of the organization meeting of the Alpha Quicksilver Company, or the report made by the defendant while in charge of the mine as receiver, or the testimony of the witness who examined the mine in 1919. It was defendant's contention at the trial that he did not mean what he said in a portion of the statement which was charged in the information to be false, and that the falsity of that portion of his statement was solely the product of a typographical error made by the stenographer. The three items of testimony which the majority opinion holds were erroneously admitted had a legitimate tendency to contradict and rebut this claim of defend-

ant, in that they tended to show that other statements made by the defendant in the same application were also false and must have been known by the defendant to be false when he made them.

I agree with the majority opinion that the trial judge should have refrained scrupulously from the making of any suggestion to the jurors as to the weight of the evidence or credibility of a witness, either by commenting thereon in the presence of the jury, or by the manner in which he cross-examined the witness. It appears from the record that the trial judge did in several instances overstep the bounds of propriety, but I am loathe to characterize his action in this respect as misconduct. However, even though entirely inadvertent on his part, it would nevertheless entitle the defendant to a reversal if it operated to his substantial prejudice to an extent which deprived him of a fair trial, but I do not think that such was the case herein. An examination of the entire evidence in the case convinces me that the statements charged in the information here were false and that they were made by the defendant willfully and with a design to deceive the corporation commissioner. Under these circumstances I cannot concur in a reversal of the judgment.

Waste, J., concurred.