[Crim. No. 4306. In Bank.—September 21, 1940.]

THE PEOPLE, Respondent, v. ERWIN P. WERNER et al.,
Defendants; ERWIN P. WERNER, Appellant.

Morris Lavine for Appellant.

Earl Warren, Attorney-General, and Eugene M. Elson, Deputy Attorney-General, for Respondent.

CARTER, J.—In an indictment returned by the grand jury of Los Angeles County the defendant and his wife were charged with having solicited one William McNeil, the principal prosecution witness, to offer and join in the offer of a $2,500 bribe to a named deputy district attorney with intent to corrupt the latter with respect to the prosecution of said McNeil on grand theft charges then pending against him. In a second count based on the same transaction defendant and his wife were charged with attempted grand theft of the $2,500 from McNeil. The jury disagreed upon the first trial. Upon the second trial the defendants were convicted on both counts. However, on appeal a reversal was ordered on the ground that the convictions were inconsistent in that the money could have been procured from McNeil either for bribery purposes or because the defendants intended to divert it to their own use but that both intents could not have co-existed. (*People* v. *Werner,* 29 Cal. App. (2d) 126 [84 Pac. (2d) 168].) Upon the third trial defendant and his wife were acquitted on the count charging solicitation of a bribe but convicted of attempted grand theft of $2,500. Motions for new trial were made and denied. Each defendant appealed, though the wife has since dismissed her appeal. There is here pending only the appeal of Erwin P. Werner from the order denying his motion for new trial.

Chronologically, the record discloses substantially the following train of events. In 1933 McNeil, the prosecuting witness, became acquainted with a Mrs. Bovell who in the course of time delivered into his possession for investment purposes some $155,000 in cash and bonds. In 1936 Mrs. Bovell employed the services of one Bergman, an attorney, in an effort

to compel McNeil to return her property. McNeil was represented by the appellant Werner who in time had McNeil deliver certain trust deeds, aggregating $16,000, to Mrs. Bovell. In April, 1937, the appellant sued McNeil and his wife for $7,500 for his services in connection with the Bovell settlement. This suit admittedly engendered ill feeling by McNeil toward appellant. In July, 1937, and after investigation by the bunco detail of the Los Angeles police department and the district attorney's office, a criminal complaint was filed against McNeil, charging him with one count of grand theft in connection with the Bovell matter and six other counts of grand theft growing out of McNeil's financial dealings with another woman. At the conclusion of a preliminary hearing held on August 2, 1937, McNeil was bound over to the superior court on the seven counts of grand theft. Shortly thereafter McNeil and the Werners met and held several conferences, during the course of which certain proposals were made, which later formed the basis of this prosecution.

There is testimony to the effect that at or about the time of McNeil's preliminary examination on the grand theft charge, the appellant telephoned to the attorney representing McNeil in the civil action for attorney's fees brought by appellant and informed him that he had unsuccessfully tried to contact McNeil and that he (appellant) could "have that case of the People against McNeil dismissed". Appellant was thereupon referred to another attorney representing McNeil in the criminal prosecution, whom appellant telephoned and informed that "he was in a position to square the beef for Mac". Subsequent to McNeil's preliminary examination, appellant again telephoned to the latter attorney and told him it was "not too late yet to fix the matter" and that if McNeil desired to get in touch with him to write to him general delivery at Merced, where appellant then resided. McNeil's two attorneys informed him of their conversations with appellant. Thereafter and on Tuesday, August 17, 1937, McNeil wired appellant to inform him immediately if he (appellant) could be in Los Angeles on that or the following day. The telegram further stated "Contact me personally at my home. Regard this strictly confidential". While on the stand in this trial McNeil testified that when he sent the telegram to appellant he disliked him heartily because of their prior financial difficulties and that he desired to ascertain why appellant

"was still anxious to see me, and I sent the telegram". After receipt of the telegram and on Friday of the same week the appellant visited McNeil at his home. McNeil testified that at that visit the appellant stated that he and Mrs. Werner had some good ideas as to how to handle the criminal action being prosecuted by Mrs. Bovell against McNeil and that Mrs. Werner was well acquainted with the then chief deputy district attorney and that for about $2,500 he could get the latter to "kick this case out of the District Attorney's office" provided also that some settlement be made with Mrs. Bovell, the prosecuting witness. Before appellant left Los Angeles to return to Merced, McNeil drove him to Mrs. Bovell's place of residence and picked him up there approximately two hours later, at which latter time appellant reported that he was working himself into the good graces of Mrs. Bovell and hoped ultimately to have her drop her attorney from the case and enter into a settlement of the McNeil matter with him.

Without detailing all the facts with respect thereto, McNeil's asserted distrust of appellant and his belief that appellant was trying to "shake him down" were conveyed by a friend of McNeil to the deputy district attorney handling the Bovell prosecution then pending against McNeil, with the result that McNeil, pursuant to request, called at the office of said deputy district attorney. As a result of this conference, an investigator from the district attorney's office, agreeably to McNeil, installed a dictaphone microphone in the latter's home with a view to listening in on future conversations between McNeil and the Werners. On August 25, 1937, appellant and Mrs. Werner called at McNeil's home. Already secreted in the basement thereof were an investigator and a stenographer from the district attorney's office, stationed there for the purpose of hearing and reporting the conversation of the Werners with McNeil. The latter testified that upon the occasion of this visit and while appellant was in another part of the house shaving, Mrs. Werner stated to him that "anything that was to be handled in the settlement of this matter in the District Attorney's office, she would handle, herself; and if she didn't get to handle the money she would not have anything to do with it . . . and that she could have this case dismissed in the District Attorney's office by paying to . . . the Chief Deputy District Attorney, $2,500" and that

she knew the chief deputy well. McNeil further testified that after appellant's return to the room appellant stated what he thought should be offered to Mrs. Bovell by way of settlement, suggesting McNeil's home and furnishings, two bungalows, and $10,000. On the following day the Werners again returned to the McNeil home and reported having had dinner with Mrs. Bovell on the preceding evening, at which the subject of settlement was satisfactorily discussed. McNeil testified that at this meeting appellant stated that the $10,000 should be advanced "right now", as he "could not do business on jawbone". However, unknown to appellant, and this definitely appears both from the testimony of McNeil and Mrs. Werner, a secret arrangement had been entered into between the latter two persons whereby it was agreed that Mrs. Werner was to see McNeil alone some time on the following day and that appellant was not to know of this meeting. Mrs. Werner accordingly called alone the following afternoon and McNeil testified it was then agreed between them that when she called that evening with appellant, McNeil was to inform appellant the money would not be available until the following day and that McNeil should secretly "slip" Mrs. Werner the $10,000 in an envelope that evening in the event appellant left the room. McNeil testified further that Mrs. Werner stated that she was to see the chief deputy district attorney the next morning "and give him the $2,500" pursuant to a prior agreement on his part to dismiss the McNeil prosecution upon such payment.

On the evening of the same day (August 27, 1937), the day mentioned in the indictment, the Werners again called on McNeil. During the evening the appellant left the room and went to the bathroom for a few minutes and in his absence Mrs. Werner asked McNeil to give her the money, which he did, whereupon she pinned the envelope purportedly containing the same inside her dress. The testimony of McNeil, the prosecuting witness, and of Mrs. Werner is definite and in agreement to the effect that the envelope purportedly containing the money was delivered by McNeil to Mrs. Werner unknown to the appellant and while he was out of the room and was so delivered pursuant to their prior secret agreement calling for a delivery thereof unknown to the appellant. Examination of the record fails to reveal any testimony to indicate that appellant knew of the prior secret agreement be-

tween McNeil and Mrs. Werner or of the secret delivery of the money on the night designated in the indictment. While the reason for keeping appellant in the dark as to the actual delivery of the money is presently immaterial, it appears to have been prompted by a desire to preclude the appellant from coming into its possession and perhaps diverting it elsewhere than as intended.

However, the envelope secretly handed by McNeil to Mrs. Werner did not contain either $10,000 or $2,500, but instead contained two $1 bills and eight pieces of paper cut to the size of one dollar bills. It was not McNeil's money, but had been handed to him by the district attorney's investigator for the purpose. Shortly after Mrs. Werner had secretly received the envelope and pinned it in her dress, and after appellant had returned to the room, the Werners left the McNeil home. As they walked out into the yard, they were arrested by deputies from the district attorney's office, returned to the house and, upon threat of search, Mrs Werner produced the envelope from her dress. Much of the conversations between McNeil and the Werners was heard and reported by the persons secreted in the house by the district attorney. Their testimony at the trial generally covered the subject. Among others, the chief deputy district attorney was called as a prosecution witness. He denied knowing Mrs. Werner. While the testimony of the Werners in their defense conflicted in many respects with the prosecution evidence, the jury apparently resolved such conflicts against them. However, we are not satisfied that the evidence adduced by the prosecution will support a conviction of the appellant upon a charge of attempted grand theft of $2,500 from the prosecuting witness McNeil.

It is settled that an attempt to commit a crime is compounded of two elements, viz., intent and a direct ineffectual act done toward its commission. It is equally well settled that there is a material difference between the preparation .tecedent to an offense and the actual attempt to commit it. The preparation consists of devising or arranging the means or measures necessary for the commission of the offense, while the attempt is the direct movement toward its commission after the preparations are made. In other words, to constitute an attempt the acts of the defendant must go so far that they would result in the accomplishment of the crime unless

frustrated by extraneous circumstances. (*People* v. *Anderson*, 1 Cal. (2d) 687 [37 Pac. (2d) 67]; *People* v. *Mann*, 113 Cal. 76 [45 Pac. 182]; *People* v. *Lombard*, 131 Cal. App. 525, 530 [21 Pac. (2d) 955]; 14 Am. Jur. 813–818.)

The acquittal of appellant on the charge of soliciting the offer of a bribe in violation of section 653f of the Penal Code makes it unnecessary for us to here consider the evidence addressed to that count. We are of the view that the conviction of appellant on the attempted grand theft charge is without support in the evidence for, even if we assume that throughout the preliminary conversations and meetings with the prosecuting witness, the appellant had entertained the intent to divert to his own use the $2,500 when received, we still fail to find in the record herein any direct ineffectual act on his part on the day of the alleged attempted grand theft whereby, but for extraneous circumstances, he would have perpetrated the offense of grand theft. As already stated, the record without contradiction discloses that appellant was ignorant of the prearranged plan of McNeil, the prosecuting witness, and Mrs. Werner, by which the former agreed to, and actually did, secretly deliver the money to the latter on the date specified in the indictment. It was the appellant's understanding and belief that the money was to be delivered on the following day. On the date specified in the indictment, as on the previous occasions, appellant's activities were, at best, but acts of preparation looking to the possible future perpetration of the offense of grand theft. As stated in 14 American Jurisprudence, 786, section 25: "The law does not concern itself with mere guilty intention, unconnected with any overt act or outward manifestation. A lawful act cannot be rendered unlawful merely because the actors intended to follow it by an unlawful act. . . . " True, appellant was jointly charged with his wife as a principal in the attempted crime and while normally the acts of an accomplice done in pursuance of the common plan are imputable, under the peculiar facts of this case, where the only direct ineffectual act which might have served to characterize the offense as attempted grand theft was one performed by Mrs. Werner, without the knowledge of appellant, and while acting in secret agreement with the prosecuting witness for the very purpose of concealing such act from the appellant and thereby precluding him from getting any part of the money, it is our

opinion that such act cannot be said to have been performed in concert with the appellant. This being so, it may not be imputed to him under the established rule. As stated in 14 American Jurisprudence, 824, section 80: "This rule of criminal responsibility for the acts of others is subject to the reasonable limitation that the particular act of one of a party, for which his associates and confederates are to be held liable, must be shown to have been done for the furtherance or in prosecution of the common object and design for which they combined together. If one of a number of conspirators goes outside the common plan and commits a fresh and independent act, wholly outside and foreign to the common design, the others are not to be held equally guilty of that act." In other words, the act must not be the fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design. In view of the positive and uncontradicted evidence of both the prosecuting witness and Mrs. Werner that the money by secret prearrangement between them was surreptitiously delivered to the latter without the knowledge of the appellant, and for the admitted purpose of foreclosing him from coming into its possession, it is our opinion that as a matter of law it must be held that the act of Mrs. Werner in so taking the money was not in furtherance of but foreign to the alleged common plan and, as stated, may not, in justice or reason, be imputed to the appellant.

However, even if we were to concede, without deciding, that the record sufficiently discloses both an intent and a direct ineffectual overt act by appellant toward the commission of a theft of the $2,500, the evidence still would not warrant his conviction either of theft or attempted theft for the reason that the prosecuting witness not only consented to the taking or attempted taking but actually delivered the property or money into the hands of the alleged offender. In so declaring, we are not unmindful that it often becomes necessary to resort to artifice in order to enforce the law and punish its violation. We have no quarrel with the settled rule that if the criminal intent originates in the mind of the accused and the criminal offense or attempt thereat is perpetrated, the fact that the accused is aided in the commission of the crime in order to secure the evidence necessary to prosecute him constitutes no defense. The cited rule is with-

out application here. We do not regard this as a case of improper entrapment but rather as one involving an offense or an attempt to perpetrate an offense the commission of which to be punishable must be without the consent of the owner of the property. The pertinent rule is stated, with citation of supporting authorities, in 15 American Jurisprudence, 26, section 336, as follows: "In the case of those crimes into which enters as an essential element the violation of individual rights of persons, the entrapment must not be under such circumstances as will amount to the consent of the person affected, or a necessary ingredient of legal guilt, the want of such consent, will be lacking, and the crime will not have been committed." ▮ In other words, when a person knows or suspects that a crime affecting him is about to be committed, he may, without being deemed to have consented thereto, remain passive and make no effort to prevent its commission, to the end that the criminal may be apprehended, but he may not actively participate, as here, to the extent of personally delivering his property or what purports to be his property to the offender and upon a prosecution for the theft or attempted theft thereof urge that it was taken or attempted to be taken without his consent—an element essential to a conviction therefor. The subject is discussed in *People* v. *Hanselman*, 76 Cal. 460, 462, 463 [18 Pac. 425, 9 Am. St. Rep. 238], wherein it is stated that "It is no doubt true, as a general proposition, that larceny is not committed when the property is taken with the consent of its owner; but it is difficult in some instances to determine whether certain acts constitute, in law, such 'consent'. And, under the authorities, we do not think that there is such consent where there is mere passive submission on the part of the owner of the goods taken, and no indication that he wishes them taken, and no knowledge by the taker that the owner wishes them taken, and no mutual understanding between the two, and no active measures of inducement employed for the purpose of leading into temptation, and no preconcert whatever between the thief and the owner."

In *Topolewski* v. *State*, 130 Wis. 244 [109 N. W. 1037, 1041 [118 Am. St. Rep. 1019, 10 Ann. Cas. 627, 7 L. R. A. (N. S.) 756], the following appears: "So if one procures his property to be taken by another intending to commit larceny, or delivers his property to such other, the latter purposing to

commit such crime, the element of trespass is wanting and the crime not fully consummated however plain may be the guilty purpose of the one possessing himself of such property. That does not militate against a person's being free to set a trap to catch one whom he suspects of an intention to commit the crime of larceny, but the setting of such trap must not go further than to afford the would-be thief the amplest opportunity to carry out his purpose, formed without such inducement on the part of the owner of the property, as to put him in the position of having consented to the taking. If I induce one to come and take my property and then place it before him to be taken, and he takes it with criminal intent, *or if knowing that one intends to take my property I deliver it to him and he takes it with such intent, the essential element of trespass involving non-consent requisite to a completed offense of larceny does not characterize the transaction, regardless of the fact that the moral turpitude involved is no less than it would be if such essential were present.''*

We are satisfied that there cannot be a theft or an attempted theft of a person's property when voluntarily and without compulsion of any sort, and uninfluenced by any false or fraudulent representations, he actively hands it over to the alleged thief for the purpose of apprehending him as a thief or as an attempted thief—however reprehensible the latter's intent may be—for under such circumstances the essential element of lack of consent is missing. As already stated, the prosecuting witness herein was not induced by any trick or device or false representation upon which he had placed reliance to part with his property. Instead, as shown, he had concluded that the Werners were not sincere or honest in their motives and for the purpose of securing their conviction he went far beyond the passive assistance that is permitted under the authorities to apprehend a potential offender, going to the extent of actively delivering or handing over his property or what purported to be his property, thereby depriving the offense, if any, of the essential element of lack of consent of the owner. Surely, it could not be held, all the other circumstances remaining the same, that appellant would be guilty of theft of the $2,500 if McNeil, the prosecuting witness, actually had placed that amount of money in an envelope and actively handed it over to the appellant for the

purpose of apprehending him as he left the house. Under the cited circumstances, the money would have been voluntarily delivered to the appellant with the consent of the owner uninfluenced by artifice, device or false representation, precluding any theft thereof. The same is equally true as to the charge of attempted theft thereof based on the owner's substitution and delivery of something other than the $2,500. We are of the opinion that the evidence will not support appellant's conviction.

The order denying a new trial is reversed with directions to the court below to grant the same.

Shenk, J., Edmonds, J., Moore, J., *pro tem.*, and Curtis, J., concurred.