[Crim. No. 2434.  First Dist., Div. One.  Mar. 25, 1947.]

THE PEOPLE, Respondent, v. HENRY CLAY WALLACE et al., Appellants.

Clyde E. Cate, J. G. Crichton and Ralph Robinson for Appellants.

Robert W. Kenny and Fred N. Howser, Attorneys General, David K. Lener, Deputy Attorney General, Ralph E. Hoyt, District Attorney, Richard H. Chamberlain, Chief Assistant District Attorney, and Cecil Mosbacher, Assistant District Attorney, for Respondent.

PETERS, P. J.—Barry Thomas and Henry Clay Wallace were found guilty of attempted grand theft. From the judgment of conviction and from the order denying the motions for a new trial they prosecute this appeal.

The two defendants were indicted on two counts. The first count charged them with conspiracy to commit grand theft. By this count the defendants were charged with having conspired, between April 22, 1944, and October 30, 1944, to take unlawfully the property of Evelyn Fong and the National Casualty Company of the value of $20,000. Nineteen overt acts are set forth in the indictment. The second count charged both men with an attempt to commit grand theft, in that from April 22, 1944, to October 27, 1944, they attempted to take unlawfully the property of Evelyn Fong and the National Casualty Company of the value of $20,000. The jury acquitted both defendants of the conspiracy charge, but found both guilty of attempted grand theft.

The defendants have filed joint briefs. Both are Negroes. The defendant Wallace, a doctor, bases his appeal on two grounds: (1) Lack of jurisdiction of the Alameda County Superior Court over this defendant, and (2) that there was no crime committed as charged in count two of the indictment. The defendant Thomas bases his appeal solely upon the second ground mentioned above.

The record amply supports the trial court's determination that defendants are guilty of attempted grand theft. It dis-

closes a clever and cunning attempt, bunglingly executed, to defraud Evelyn Fong and her insurance carrier of damages for a spurious automobile accident.

The scene opens in the early morning hours of April 22, 1944. At approximately 1:50 a. m. of that day the Police Department of Oakland received a telephone call notifying them that a man who had been injured in an automobile accident was in front of the telephone building on Franklin Street between 15th and 16th Streets. Two police officers connected with the accident detail responded, and there found Thomas. He told the police officers that he had been struck about an hour before by a light-colored convertible sedan, with its top down, at 13th and Franklin Streets while he was in the west crosswalk proceeding in a northerly direction. Thomas produced and delivered to one of the officers a piece of paper on which was written in pencil the license number "39B582," and he told the officers that it had been written by a truck driver for a paper company and delivered to him, and that this truck driver told Thomas that he saw the accident, that he had taken the license number of the offending car, and that the number on the paper was the number of that car. At the trial a handwriting expert testified that after comparing the letters and numbers on this paper with known exemplars of Thomas' handwriting he was of the opinion that the license number had been written by Thomas. There was no contrary expert testimony. The exhibits attached to respondent's brief demonstrate, almost to a certainty, the correctness of the opinion of the expert.

Thomas further told the officers that he had been hit on the left side of his body and that he was in great pain. The officers thereupon sent Thomas to the emergency hospital for examination and treatment. After Thomas had been placed in the ambulance the police officers proceeded to the scene of the alleged accident. About two hundred feet west of Franklin Street, parked in front of a Chinese restaurant on the north side of 13th Street, they found a light-colored convertible sedan with its top down with the license number given them by Thomas. The officers waited in the vicinity for the occupants of the car to return. Within a short time Evelyn Fong, a Chinese girl, and her three companions, appeared and got into the car. The police officers then appeared, told the occupants not to talk to each other, and one of the officers drove the occupants and the Fong car to the police station. There

the occupants were interviewed separately. Miss Fong and the others denied having hit any pedestrian on the night in question. On the trial Miss Fong and one of her companions were called as witnesses—the other two not being called. They told on the witness stand the same story they had told the police officers, namely, that on the night in question they had not passed the intersection of 13th and Franklin Streets; that they had proceeded out Broadway in a northerly direction, Miss Fong driving; that they had turned easterly on 13th Street and proceeded to the middle of the block where there was a parking lot on the south side; that they drove into the parking lot and found it closed; that they then backed out into 13th Street, made a "U" turn and parked in front of the restaurant where the car was found. If this story is true, and it evidently was believed by the jury, the Fong car on the night in question never reached the intersection of 13th and Franklin Streets where the accident is supposed to have occurred.

The officers at the police station carefully examined the Fong car. They found that it had been polished recently and was covered with a fine film of dust. They found that this film of dust was undisturbed and that there were no brush marks of any kind on the car as would probably be present had the car hit a pedestrian.

Thomas was admitted to the emergency hospital at 2 a. m. Shortly after his admission the two officers who had first interviewed him arrived at the hospital. They made an examination of his clothing and found no dust or dirt or other indications that he had fallen in the street. Thomas was then lying on the examination table and the officers examined his body and were unable to find any visible bruises or abrasions, or other visible indications of injury. The officers then again interviewed Thomas, and he reiterated substantially the same story he had first told. He was most positive in his statement that just prior to the accident he had been down to 8th and Franklin Streets where he had eaten, and was proceeding northerly on Franklin Street when hit. He also stated that he was picked up by an unidentified sailor, and then crawled from 13th and Franklin Streets to the telephone building looking for a policeman or telephone. When asked by the officer how he could have been hit on his left side if the automobile was coming from his right, he began to cry and accused the officer of race prejudice. He then stated that he

had been thrown by the impact against a telephone pole on the corner.

The emergency hospital record shows that Thomas was admitted at 2 a. m. and was examined by a doctor. The record shows that ''police states patient struck by car. Apparently injured back—capable to move.'' On the back of the card was written: ''Hurt back. There is marked pain in left post. chest. Evidence of fracture of 3-4 ribs in post. axillary line—no evidence of other damages. Pt. not knocked unconscious. No evidence of pneumothorax. Chest clear. Treatment and progress; chest strapped over rib area . . . discharged to private physician.'' The card also shows that Thomas was given a sedative and sent home at 2 :45 a. m.

Later that same morning—April 22nd—between 10 a. m. and noon, Thomas visited the traffic division of the police department and conversed with the officer in charge. He asked if the driver had been found that had hit him, and also asked the officer to return the sheet of paper on which the license number had been written. This the officer refused to do.

On the afternoon of the same day Thomas visited an Oakland attorney, Maurice J. Bleuel. This attorney testified that he had never seen Thomas before, and had no previous appointment with him, but that Thomas told him that a police officer had recommended him. He told Bleuel substantially the same story he had told the police officers. He appeared then to be in considerable pain. The attorney agreed to represent Thomas on a contingency basis.

During this, or one of the subsequent conferences with Thomas, he told Bleuel he knew someone in Fresno who knew the fellow who had given him the license number. The attorney suggested that Thomas see a doctor and have X-rays taken, but Thomas replied that he wanted to see his wife and family in Fresno, and that he had a family doctor by the name of Wallace in that city. The attorney advised Thomas to have Wallace examine him, and when informed that Wallace was also a Negro, suggested that Thomas secure an examination by a white doctor. Bleuel also testified that he questioned Thomas about the condition of his health prior to the accident and Thomas replied that he had always been in perfect health and never had been in a prior accident of any kind except for a minor injury suffered in Texas many years before. Thomas also told Bleuel, in response to a direct ques-

tion, that he had been working full time at the Kaiser Ship-yards in Richmond up to the day before the alleged accident, at a wage of $1.00 per hour. This last statement was demonstrated to be false. The official records of the Kaiser Ship-yards in Richmond show that Thomas started to work there in the week of March 5, 1944, and that he worked intermittently until March 30, 1944, when he quit. The evidence also shows that from April 4, 1944, to April 15, 1944, Thomas worked for a title insurance company in Oakland as a janitor.

On April 23, 1944, the officers again visited the scene of the accident. On one of the corners of the intersection in question is a newspaper publishing house. The officers interviewed various truck drivers of the newspaper company in an attempt to discover the driver who Thomas said had given him the license number. They were unable to find that driver, and were unable to find any witness to the accident.

On April 24, 1944, a police officer took Thomas to the home of Miss Fong. Thomas identified her car as the one that had struck him. Miss Fong, in Thomas' presence, denied having struck him or anyone else on the night in question. She also told the officer and Thomas that she had liability insurance on the car. The evidence shows that she then carried, with the National Casualty Company, a $25,000-$50,000 public liability policy.

On April 25, 1944, one of the officers again saw Thomas. The officer testified that Thomas told him that he was going home to Fresno, and that he told Thomas to leave his address with the police department. Thomas agreed to do so. On this same day Thomas also saw his lawyer and told him that he was going to Fresno at once to see his family and doctor. He told Bleuel he needed some money to pay for his room rent and to get to Fresno and Bleuel loaned him $15.

On April 26, 1944, Thomas again visited Bleuel. When the attorney expressed surprise that Thomas was still in Oakland, Thomas stated that his landlord had driven him down to Fresno and back the night before, and that they had driven all night. The landlord testified that this was false, and that he had never driven Thomas any place outside of Alameda County. Bleuel again asked Thomas for the name of the witness who had seen the accident. Thomas replied that he knew the witness; that he was in Fresno; that the witness did not want to come to Oakland; that he, Thomas, did not want to

give the name to the police. Thomas also told Bleuel he was broke, and the attorney gave him a dollar to get some food.

On April 27, 1944, Thomas returned to Bleuel's office and signed a verified complaint charging Evelyn Fong with negligence. The complaint alleged the facts of the accident; charged that as a result thereof Thomas suffered injuries to his back and spine; that he fractured four ribs; that he suffered various internal injuries and nervous shock; that said injuries were permanent in character; that he suffered damages in the amount of $20,000. This complaint was filed on the day it was signed and shortly thereafter the summons and a copy were served on Miss Fong.

At this time Bleuel advanced $35 to Thomas and also asked him the name of the eyewitness. Thomas told his attorney that the witness was demanding $100 to come to Oakland to testify. He refused at this time to identify the witness. A few days later Thomas again visited Bleuel and this time gave Bleuel a card with a name printed thereon, and told him that was the name of the eyewitness. Thomas requested Bleuel not to give the name to the police. Bleuel so agreed, but nevertheless did give the name to the police. About a week later Bleuel telephoned to Thomas in Fresno and told him that the police were giving him one more chance to produce the eyewitness; that the man whose name had been given to Bleuel had been interviewed by the Fresno police and had stated that he had not been in Oakland for two years and knew nothing about the accident, and that he was the brother-in-law of Thomas. Thomas told Bleuel that he would come right up to Oakland to explain, but he failed to keep the promise. Later he told Bleuel he had mixed up the names and would produce the witness, but he never did.

Before discussing the balance of the facts, and particularly those that tend to connect defendant Wallace with the attempted grand theft, the dates above mentioned should be emphasized. The records demonstrate that Thomas did not work for Kaiser after March 30, 1944. The records demonstrate that from April 4th to 15th Thomas was in Oakland working for the title company. The evidence of many witnesses demonstrates that Thomas was in Oakland every day from April 22, 1944, to and including April 27th. It would have been practically impossible for Thomas to have been in Fresno before the night of the 27th or the morning of the 28th. The significance of these dates will become apparent

when the facts tending to connect Dr. Wallace with the crime are reviewed.

Bleuel testified that when Thomas told him about Dr. Wallace in Fresno, he, Bleuel, told Thomas to have Wallace telephone him. In apparent answer to this request Bleuel testified that Wallace telephoned to him sometime in April or early in May, 1944; that they discussed the facts involved in the pending action; that Wallace told Bleuel that he had examined Thomas and retaped his back; that he found that Thomas was suffering from ''possible radiatory pain from spinal cord around to the sternum''; that he requested Wallace to send him a regular doctor's report. About June 20, 1944, Bleuel received a letter postmarked June 19, 1944, and dated June 14, 1944, from Wallace with a statement enclosed. They read as follows:

''Dear Sir:

Inclosed finicial [sic] statement for Barry Thomas, 1439-F-Street, Fresno, California, for medical service from April 8, 1944 to June 12, 1944.

Prognosis: Good, has fully recovered from his injury.

I have this day, released said, Barry Thomas.

Respectfully,<br>
/s/ H. C. Wallace, M.D.<br>
H. C. Wallace, M.D.''

To the foregoing letter was attached the following statement:

''S T A T E M E N T

Mr. Barry Thomas

1439-F-Str; Fresno, Calif;<br>
In Account With<br>
Dr. H. C. Wallace

| Service Rendered | Amount |
|---|---|
| For injury of back, | : |
| hand and neck. | : |
| From April 8th to June | : |
| 12, 1944. Treatments 3 | : |
| times weekly. | : |

Total ............$138.00<br>
/s/ H. C. Wallace, M.D.<br>
Signed      H. C. Wallace, M.D.<br>
1149-F- Street.''

It was stipulated that the signatures on the letter and statement were those of Dr. Wallace. It should be noted that by the letter and statement Dr. Wallace claimed to have treated Thomas three times weekly from April 8, 1944, to June 12, 1944, for injuries purportedly received in an accident which did not occur until April 22, 1944. At the trial the doctor claimed that this was an error in bookkeeping, and that the treatment on April 8, 1944, was for an industrial injury hereafter discussed. He was quite positive that he first saw Thomas in Fresno on April 24th—a date when Thomas was in Oakland. Thomas could not have come to Fresno until April 27th at the earliest. The doctor's records introduced into evidence had obviously been altered, and his explanation of these alterations was confused and unconvincing.

On May 17, 1944, another chapter in this strange tale opens. On that date Thomas consulted a Fresno attorney by the name of Julius Hansen, and told him that he had received an industrial injury to his hand and back at the Kaiser Shipyards in Richmond on April 5, 1944. It is to be noted that the last day Thomas worked for that company was March 30, 1944, and that he was working for the title company in Oakland from April 4, 1944, to April 15, 1944, and, therefore, could not have been in Fresno during those dates. Thomas did not tell Attorney Hansen about the alleged automobile accident or about his pending suit against Miss Fong. It should be here mentioned that Thomas did not tell Bleuel about the industrial accident proceeding until Bleuel discovered it for himself in October of 1944.

In regard to the shipyard injury, Thomas told Hansen that he had been injured on April 5, 1944, while shoveling hot asphalt from a truck; that the tail gate fell down and hit his left hand and broke a finger; that he was knocked against the truck and injured his back; that until April 8, 1944, he received medical attention at the shipyards; that his left hand was permanently disabled and that his back was still injured. Hansen filed an application with the Industrial Accident Commission for adjustment of the claim in accordance with the information furnished by Thomas.

The medical reports of the shipyards do show that Thomas received an industrial injury while working for Kaiser, but at a date and under circumstances different from those recounted to Hansen. The surgeon's report at Kaiser Shipyards

shows that on March 30, 1944, Thomas reported to the doctor that he had suffered an injury to his hand while pulling a cable, and that he told the doctor that two weeks before March 30th he had also hurt his hand and had been hit by a truck. Two reports from the first-aid station at the shipyards somewhat corroborated these statements. One dated March 11, 1944, shows that Thomas reported that he had hurt his hand while shoveling, and that on March 30, 1944, he claimed to have hurt his arm while pulling a cable, and was referred to the regular doctor. None of these injuries appeared to be serious and only casual treatment was given. Thomas failed to tell Hansen about these prior injuries.

Hansen requested Thomas to secure a medical report from his doctor. Thomas secured from Dr. Wallace a statement reading: "Service Rendered. Medical attention for injury— $90.00." Attached to this statement was a letter admittedly signed by Dr. Wallace and addressed "To Whom it may concern." This letter reads as follows:

"This will certify that Barry Thomas, 1439-F-Street, Fresno, California, has been under observation and treatment for injury, beginning April 8th to June 12 1944.
Namely: Sprained muscles of back and Lumbar Region, also 8-9 and 10th ribs fracture, hand fracture, articulation hand and small Diget.
Prognosis: Good.
Recommendation:. Released, June 12, 1944."

This statement and letter were prepared on June 20, 1944, six days after Dr. Wallace had prepared, and one day after he had mailed, the letter and statement to Bleuel showing treatment over the same period for substantially the same injuries and submitting a bill for $138.

A hearing was had before a referee of the Industrial Accident Commission in Fresno, June 20, 1944. Thomas appeared and testified and became very confused as to the time, nature, number and causes of his accident at the shipyards. He submitted the statement and letter of Dr. Wallace to the referee and the referee asked for a more detailed statement from Dr. Wallace. Thomas obtained such a statement and submitted it to the referee that same afternoon. It reads as follows:

|  | Amount |
|---|---|
| "Injury-Left Hand | : |
| Fracture Palm Digit Small finger | : |
| Articulation— | : |
| Side. 9 & 10 Rib.   Fracture | : |
| Muscles back, Sprain— | : |
| April 8th—To June 12th | : |
| 1944—3 times week— | : |

Total ..........$90.00"

This was signed by Dr. Wallace. Thus on June 14, 1944, we find Dr. Wallace writing to Bleuel stating that he had treated Thomas three times weekly from April 8, 1944, to June 12, 1944, for injury of "back, hand and neck"; that such services were worth $138, and that by June 12, 1944, Thomas had fully recovered. On June 20, 1944, we find Dr. Wallace preparing statements submitted to the Industrial Accident Commission in which he claims to have treated Thomas for identically the same period, three times weekly, for an injury and fracture of a finger on the left hand, for fractures of the eighth and ninth ribs and for a back muscle strain. The value of these services was set forth as $90. At the trial Dr. Wallace sought to explain this most damaging evidence by the statements that Thomas never told him about the pending industrial accident case; that he never talked with or knew of Hansen; that when Thomas asked for the statements on June 20th, he, Wallace, thought they were for Bleuel to be used in the personal injury case. He also sought to explain the difference in amounts in the statements by the explanation that when he prepared the Bleuel statement he anticipated future treatments for Thomas while the "To Whom it may concern" statement was only for treatments up to June 12th. He so testified even though in the letter to Bleuel he had stated: "Prognosis: Good, has fully recovered from his injury. I have this day, released said, Barry Thomas." The sufficiency of this explanation was for the jury. It, quite evidently, disbelieved this story. It was certainly justified in doing so.

A second hearing before the referee was held in San Francisco, but neither Hansen nor Thomas then appeared. Dr. Franklin of the shipyard medical staff testified that he had examined Thomas on March 30, 1944, and had found no injury to his back or ribs, and that according to the Xray there

was no evidence of any recent fracture to the hand, but only evidence of an old injury or change due to a disease. On the trial of the present action his testimony was substantially the same.

Subsequent to this hearing Hansen learned of the personal injury suit against Fong, and when the Commission disallowed Thomas' claim, he, Hansen, refused to proceed further in the case. Nothing further was done by Thomas in the Industrial Accident Commission proceeding.

Nothing of any great importance happened in the Fong action until September 8, 1944, when Thomas' deposition was taken in Bleuel's office in Oakland. In the deposition he testified that he had eaten dinner at 8th and Franklin Streets and was proceeding north on the west side of Franklin Street when hit on the right hip and was thrown against a pole. At the trial he was most positive that the accident occurred while he was on the way to the restaurant while he was proceeding south on Franklin Street. He told this same story to the district attorney when arrested October 26, 1945.

In his deposition he reiterated his story about the license number and his trip to the emergency hospital. When asked if he had ever suffered any prior injuries he stated that many years before a ''little piece of wood fell out of a car and hit me on the shoulder.'' He was most positive that other than this one injury he had never before been injured in any way, and that he had never claimed damages or compensation for past injuries. On the trial this testimony was demonstrated to be false. It was shown that he had been injured while working at a pickle factory, for which he made a claim to the Industrial Accident Commission and received a small award; that on February 11, 1942, he claimed to have been injured while working for a cotton compress company. The claimed injury was to his hand. The insurance carrier paid him $83. He was also shown to have received an industrial injury to his stomach, and one to his back, sometime in 1943. Apparently only medical care and no compensation was paid for these. On December 18, 1943, while working for a Bakersfield concern, he claimed an industrial injury to his back for which the insurance carrier of the employer paid him $359.21. He did not mention the claimed shipyard injuries in his deposition.

The next important date is October 17, 1944. On that date

Bleuel wrote to Dr. Wallace telling him that he had arranged to have Wallace's deposition taken in Fresno in the Fong action in order not to require the doctor to come to Oakland. In the letter Bleuel recounted for the doctor's information the facts of the case as recounted to him by Thomas and as testified to by Thomas in his deposition, including the statements made to Bleuel and in the deposition to the effect that Thomas had stated that he had never had any prior accidents.

The deposition was taken in Fresno on October 21, 1944. Before the deposition was taken Bleuel called at Dr. Wallace's office and asked him about Thomas' injuries. Dr. Wallace told him that he had never treated Thomas before for any sickness or injury, but that he had known Thomas and his family for some time prior to the accident and that Thomas always, prior to that time, had appeared to be alert and in good condition—that "as far as he knew he had never had any prior injuries or been in any prior accidents."

In his deposition taken, as he knew, for use in the Fong action, Dr. Wallace testified that prior to April 22, 1944, he had never treated Thomas before; that he was first called to the Thomas home in Fresno on April 24, 1944, and found Thomas in bed and in considerable pain, particularly in his chest; that he was told that Thomas had been hurt in an automobile accident in Oakland; that he examined him and found "a palpitation, a swelling along the third, fourth and fifth ribs on the left side under the scapula"; that he had a cough and the sputum was tinged with blood; that his diagnosis was that the third and fourth ribs were fractured; that there was a stiffness in the joints of his left arm and also left shoulder, although these were not fractured; that his hip was bruised and swollen; that on April 25, 1944, Thomas came to his office for a more complete examination and that his original diagnosis was verified; that he treated the man's left lung because he felt sure that there had been an internal injury to that lung; that he treated Thomas daily from May 1st to May 10, 1944, and thereafter every two or three days until August 1, 1944; that Wallace was then out of town until early in September, and that he treated Thomas on September 10th and 15th, 1944, and a couple of times thereafter; that he took no Xrays; that Thomas' condition on the date of the deposition was fair; that he could, however, only do light work and that he doubted if he could do heavy work; that Thomas still suffered considerable pain in his spine if he did too much stooping or lifting; that there was a possibil-

ity that Thomas would suffer permanent pain from the injury; that the reasonable value of his services to date was $250. It should be mentioned that, although he purportedly was testifying from a summary made by him from his records, he clearly falsified the date treatment commenced. Thomas, as several times pointed out, could not have been in Fresno before April 27, 1944. Moreover, this statement as to dates was directly contrary to the prior statements made to Bleuel and Hansen, and directly contradicted these statements in that in those statements Wallace had represented that Thomas was completely recovered by June 12, 1944.

The action of *Thomas* v. *Fong* was set for trial on October 27, 1944. Shortly before the trial date Bleuel first learned of Thomas' alleged industrial injury and his attempt to collect compensation for it. Bleuel also learned at this time that medical reports prepared by Wallace covering the same treatments as those Wallace had sent him, had been submitted to the Industrial Accident Commission. Bleuel telephoned Thomas in Fresno and left a message that Thomas should be in his, Bleuel's office, at 9:30 a.m. on October 27th. On that date, when Thomas failed to appear, Bleuel filed a dismissal of the action against Fong. Thomas did appear at Bleuel's office October 30, 1944. At this time Bleuel talked to Thomas in the presence of a stenographer who took down the conversation in shorthand. This conversation was admitted in evidence at the trial. Bleuel first went over the details of the alleged accident with Thomas, and then told him that he knew of the industrial accident case. Thomas told him that involved only his left hand and no other part of his body. Some acrimonious words were exchanged and Bleuel told Thomas of the seriousness of the thing he had done in falsely accusing Miss Fong of a felony. He got Thomas to sign a dismissal of the action and then told him to get out of the office. Thomas started to cry and left.

It should be here noted that Bleuel at no time talked to Dr. Wallace about the Fong action before it was filed, and that Hansen at no time talked to the doctor about the industrial accident case.

The two defendants were arrested in October of 1945, and both gave statements to the district attorney that were read into evidence. The statements of both defendants materially varied from their prior statements and from their testimony on the trial. Thomas' various statements, in both minor and

major details, were hopelessly inconsistent, while the statements made by Dr. Wallace in his deposition, to the district attorney, and on the trial, varied in material matters. Many of his statements were contradicted by Bleuel and other witnesses. These conflicts were for the jury.

So much for the facts. The record amply shows an attempt by both defendants to procure money from Miss Fong or her insurance carrier by means of false and fraudulent representations. But, say defendants, the evidence does not show an attempt, but, at most, shows mere preparation. Defendants argue that all that was shown was the filing of the civil action, the denial of liability, the taking of depositions, and the dismissal. This, they say, falls short of an attempt. In support of their contention the case of *State* v. *Block,* 333 Mo. 127 [62 S.W.2d 428], is cited. That case involved a charge against one Block that he had attempted to obtain money from an insurance company by means of trick and pretense—substantially the charge here involved. The indictment in the Block case charged Block with driving his car on a certain day and having a pretended collision with another automobile; with pretending that Lanigan was the driver of the other car; with pretending that he, Block, had as his passenger, one Oleatha Jones; with pretending that Oleatha Jones was injured in the pretended collision; with pretending that a named doctor had examined and treated Oleatha Jones; with pretending that Block then tried to settle the suit with an insurance company. The indictment was quashed on the ground that it failed to charge any indictable offense. On appeal the judgment quashing was affirmed, one of the holdings of the appellate court being that the indictment at most alleged mere preparation and not an attempt. In this connection the court stated (p. 431 [62 S.W.2d]): "In other words, unless Oleatha Jones agreed to participate in the fraud, there can be no crime charged against this respondent, because Oleatha Jones had a right to abandon the criminal attempt originated by this respondent. There is no allegation in the indictment that Oleatha Jones had agreed upon the plan to defraud this insurance company. It would certainly be necessary for her to participate in the plan leading towards its commission. Respondent had no authority to settle this claim for Oleatha Jones or to do anything on her behalf in the settlement of this claim. The indictment further fails to allege that the agents of the insurance company had agreed to the settlement of the claim for the amount asked by respondent, or in fact for any

amount. All the indictment alleges is the mere presentation of the claim with an offer or demand of settlement for a sum certain, and, even with a criminal intent, that would not constitute a crime. At best, the indictment alleges a mere preparation to commit a crime where no overt act is alleged to have been done in the consummation after such preparations.''

It is apparent that the facts of the Block case differ materially from those in the instant case. In the Block case the person injured—Oleatha Jones—was not a party to the fraud. Her participation was indispensable if the attempt was to be successful. Until she consented, no attempt could get beyond the preparatory state. But in our case, Thomas, the person allegedly injured, was an active participant in the plan to defraud Fong and her insurance carrier.

██ Insofar as the Block case may intimate that no attempt to secure money by false pretenses can be complete unless the victim relies upon or is deceived by the false pretenses, it is clearly contrary to the California law and to the overwhelming weight of authority elsewhere.

One of the latest cases in California on this subject is *People* v. *Grossman,* 28 Cal.App.2d 193 [82 P.2d 76], where an attorney attempted to defraud an insurance company after that company had full knowledge of his plan. Among other things he was indicted for an attempt to commit grand theft, and was convicted of that offense. He urged, on appeal, that no attempt was committed because the insurance company was not deceived by his false representations.. The court, at page 204, summarily dismissed the contention with the following statement: ''The defendant also contends it was necessary for the prosecution to prove, under the counts pleading attempts to obtain money by false pretenses, that the victim relied upon the alleged false pretenses. But the law is well settled to the contrary,'' citing in support an annotation in 89 A.L.R. 342; *People* v. *Arberry,* 13 Cal.App. 749 [114 P. 411] and *In re Harper,* 17 Cal.App.2d 446 [62 P.2d 390].

The general rule in effect in most American jurisdictions, amply supported by citation of authorities, is stated as follows in 22 American Jurisprudence, page 487, section 80: ''While it may be said to be the general rule that the completed crime of obtaining money or property under false pretenses cannot be established unless it appears that the person alleged to have been defrauded believed the false pretense to be true and was deceived, a distinction is drawn between the completed crime

and the attempt to commit it, the rule being established that the offense of attempting to obtain money or property under false pretenses may be committed although the prosecuting witness knew that the pretenses were false or, irrespective of whether they were true or false, did not rely on them." The fact that the victim is or is not deceived is a false factor in such cases.

In order to constitute an attempt there must be a specific intent to commit a particular crime and a direct ineffectual act done toward its commission after preparations have been made. The acts must be such as would naturally result in the accomplishment of the completed offense unless frustrated by extraneous circumstances. (See *People* v. *Werner,* 16 Cal.2d 216 [105 P.2d 927] ; *People* v. *Miller,* 2 Cal. 2d 527 [42 P.2d 308]; *People* v. *Lanzit,* 70 Cal.App. 498 [233 P. 816]; see cases collected 7 Cal.Jur. p. 875, § 31 et seq.; 135 A.L.R. 1157.)

The filing of the civil action by Thomas; the giving of the depositions by Thomas and Wallace to be used in that suit; and the giving of the various statements by both defendants knowing they were to be used in that suit, amply meet the tests above stated.

Both defendants also claim that because they were acquitted of the conspiracy count that they were necessarily acquitted on the attempt to commit grand theft count. Defendants' contentions in this regard lack merit. They point out that section 182 of the Penal Code defines criminal conspiracy, and that subdivision 1 of that section prohibits conspiracies to commit any crime, while subdivision 3 prohibits conspiracies to falsely maintain any action. They urge that, although they were indicted under subdivision 1 of section 182, their acquittal of that count, since the only crime proved was the false maintenance of a civil action, necessarily included an acquittal of the crime prohibited by subdivision 3. Based on this somewhat doubtful premise it is urged that an acquittal of the crime defined in subdivision 3 of section 182 necessarily amounted to an acquittal of attempted grand theft, because such attempt was proved only by the filing of the civil action.

Even if the verdicts here involved were inconsistent a reversal would not be required. The Supreme Court in *Rodriguez* v. *Superior Court,* 27 Cal.2d 500 [165 P.2d 1], has recently reviewed the authorities dealing with the effect of in-

consistent verdicts, and particularly with the cases interpreting section 954 of the Penal Code, and has held that inconsistent verdicts of acquittal on one count and conviction on another do not compel a holding that the judgment of conviction is a nullity.

Moreover, the specific point now raised has been heretofore decided adversely to appellants. In *People* v. *Talbot,* 220 Cal. 3 [28 P.2d 1057], the defendants were charged with conspiracy to commit grand theft and with grand theft. One appellant was found not guilty on the conspiracy count and guilty of grand theft. He urged on appeal that the conspiracy count, as defendants urge in the instant case, involved the same overt acts of which he was found guilty on the grand theft count, and for that reason he should have been found not guilty of the substantive offense, because such verdicts were inconsistent. The court correctly disposed of the contention by the observation that the verdicts were not inconsistent because a conspiracy involves a criminal agreement, which element is not involved in the substantive charge. In *People* v. *Martin,* 114 Cal.App. 392 [300 P. 130], it was directly held that the crime of conspiracy is a distinct offense from the actual commission of the crime forming the object of the conspiracy. In addition, section 954 of the Penal Code provides that: ''A verdict of acquittal of one or more counts shall not be deemed or held to be an acquittal of any other count.'' (See, also, *People* v. *Guerrero,* 22 Cal.2d 183 [137 P.2d 21] ; *People* v. *Hickman,* 31 Cal.App.2d 4 [87 P.2d 80] ; *People* v. *Amick,* 20 Cal.2d 247 [125 P.2d 25] ; *People* v. *Kearney,* 20 Cal.2d 435 [126 P.2d 612].) The point lacks merit.

Both defendants urge that no crime was committed because, so it is claimed, the filing of a civil suit cannot constitute the overt act necessary for the crime of attempt to commit grand theft. In support of this contention defendants cite *Hunter* v. *State,* 46 Tex.Cr.Rep. 498 [81 S.W. 730] ; *Commonwealth* v. *Harkins,* 128 Mass. 79 and *In re Nichols,* 82 Cal.App. 73 [255 P. 244]. None of these cases stands for the broad proposition asserted.

In the Hunter case the defendant, after procuring an insurance policy upon his life, falsely made it appear that he had drowned, thereby enabling the beneficiary, who was unaware of the pretense, to collect the amount due under the policy, after a successful resort to the courts, the insurance

company having refused to make voluntary payment, contending that the insured was not actually dead. A final judgment was entered in favor of the beneficiary. After the discovery that the insured was alive, he was charged and convicted with the crime of swindling. Upon appeal it was held that the indictment should have been quashed since it did not contain any allegation as to whom the false pretenses were made, and that even if it be assumed that the insured's conduct was equivalent to making false representations to the insurance company, this did not have the desired effect, as the company refused to believe that the insured was dead and therefore did not rely on the false representation. The court also rejected the contention of the state that the insured had caused the fraudulent representations to be made to the court and the insurance company through the innocent agency of the beneficiary, and that his acts were intended for that purpose, saying (p. 732 [81 S.W.]) : "It will be observed there is no consent judgment here, and, if the court can be considered as the agent of the insurance company at all, it became so over its protest, and was its involuntary agent, because the company refused to believe in the death of the insured, which is the gravamen of the alleged swindle. If the principle of agency here contended for shall come to be the law, it may, as a result, deter much litigation, as an honest man with a good cause might hesitate to invoke the action of a court, for, although successful, he might find himself imperiled in the toils of a criminal prosecution. The doctrine contended for would in a measure destroy the integrity of judgments in civil cases when they could thus be attacked by a criminal prosecution. We do not believe the doctrine of agency here contended for accords with sound legal principle. The courts of the country are not to be thus involved in private prosecutions, nor can the integrity of their judgments be jeopardized by characterizing them as a part of the machinery in the consummation of a fraud. The courts of the country are independent agencies of the government, and their judgments are presumed to speak the truth. Nor will it be permitted that their judgments be assailed as the instruments of fraud, or as an agency in the perpetration of a swindle. In the very nature of things, they must stand aloof from any connection with the parties as their agent, save as a function of government—as the final arbiter between all parties, for the determination of the right and the truth as between them. *We hold*

*that, whenever their power is invoked between the attempt and the execution of the purpose to swindle, it is the intervention of an independent moral agent, which cuts off any criminal prosecution assumed to be consummated in the judgment.* Wharton, Cr. Law, Vol 1, §§ 177, 178; *Com.* v. *Harkins,* 128 Mass., 79.'' (Italics added.)

It will be noted that the Harkins case, *supra,* is cited to support this conclusion. An examination of that case shows that the majority of the court did adopt a rule similar to that announced in the Hunter case.

The rule of these cases is not here applicable. The basic fact in those two cases was that a final judgment had been secured based on the fraudulent representation of the accused, and it was held that in the criminal trial the court could not go beyond that final judgment. The implications of such a holding are somewhat startling, and the conclusion that the securing of a civil judgment is conclusive in the criminal trial is probably wrong. Be that as it may, even if that rule did apply in this state, which we doubt, it would have no application here. In the instant case no judgment was ever secured—the complaint was dismissed before trial.

The California case cited—*In re Nichols,* 82 Cal.App.73 [255 P. 244], is obviously not in point. The language relied upon by defendants was not used in discussing whether the filing of a civil suit could constitute part of the overt act necessary to constitute an attempt, but was used in defining the meaning of the terms ''unlawful injury'' as those terms are used in section 519 of the Penal Code providing that the ''fear'' that will constitute extortion may be induced by a threat to do ''an unlawful injury'' to the property of the person threatened. The case has no application here.

A case more nearly in point, and which supports the theory advanced by the prosecution, is *People* v. *Burnett,* 21 Cal. App.2d 613 [69 P.2d 1028]. In this case the defendants were charged with attempted grand theft of $500 from an insurance company. The defendants were husband and wife. They represented to an adjuster of the insurance company covering the liability of a market that the wife had fallen in said market and had received certain injuries, including a broken collarbone, for which a settlement of $500 plus all expenses was demanded. The evidence showed that the collarbone had been broken at least several months prior to the date of the

alleged accident, and that the claimant's collarbone had not been broken, nor had she been otherwise injured, in her alleged fall, and that such claim was false and that her injury was falsely claimed for the sole purpose of collecting damages from the owner of the market or its insurance carrier. The appellate court upheld the conviction of the claimants of attempted grand theft as those words are defined in section 484 of the Penal Code. That section provides: "Every person . . . who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, . . . is guilty of theft." The court held that the gravamen of that offense is (p. 618) "that defendants knowingly and designedly attempted to defraud the Massachusetts Bonding and Insurance Company by means of false or fraudulent representations or pretenses." It was held that under facts above mentioned the prosecution had sufficiently proved an attempt to commit grand theft. The number of acts committed in the Burnett case were far less than those here shown by the evidence. Even if the filing of the civil suit alone could not constitute an attempt, a point we do not decide, the giving of the various depositions by the defendants with the knowledge that they were to be used in the civil action alone is sufficient to sustain the finding of the jury that there was an attempt. Certainly, if making false representations to an adjuster for an insurance company with intent to defraud can constitute an attempt, *a fortiori*, the making of such representations with such intent, under oath, to the attorney for Miss Fong and the insurance company constitutes an attempt.

The last point necessary to discuss is the contention made by defendant Wallace that the trial court in Alameda County had no jurisdiction to try him on the attempt charge. In this respect Wallace contends, contrary to his contention on other points, that the attempt, if one existed, was complete upon the filing of the civil action, and that his connection with the offense, if any, occurred thereafter. He therefore contends that at most, so far as the attempt is concerned, he was an accessory after the fact, and that the proper county of trial for such offense was Fresno County. In this connection he relies upon the rule that an accessory must be tried in the county where the offense of the accessory was committed, notwithstanding that the principal offense was committed in another county. (Pen. Code, § 791.)

It is true that the evidence shows that the civil action against Fong was filed before Wallace was in any way connected with the transaction. He did not give his deposition in that action until several months after the answer had been filed. It is also true that Wallace was never in Alameda County during the year 1944, and that every act performed by him—treating or purporting to treat Thomas, writing letters about Thomas' condition, giving sworn testimony in his deposition, etc.—was performed in Fresno County.

The basic premise upon which this argument is predicated is that the attempt was completed and ended upon the filing of the civil action, and that all acts performed thereafter were merely in furtherance of the already committed crime. This premise is unsound in fact as well as in law. It is unsound in law because for the accessory rule set forth in section 791 of the Penal Code to apply Wallace would have to be an accessory after the fact and not one before the fact. Section 32 of the Penal Code defines the only kind of accessory known to our law as: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony." Of course Wallace does not come within this definition because what he did did not amount to harboring or concealing Thomas nor to aiding him to avoid arrest. What Wallace did in giving the statements, giving false testimony on his deposition, etc., constituted him a principal within the meaning of section 31 of the Penal Code which provides that: "All persons concerned in the commission of a crime . . . and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed."

Section 791 of the Penal Code can only apply to accessories after the fact because the offense at common law known as "accessory before the fact" is not known to the law of California, such persons being triable and punishable as principals. That being so, the offense is triable in the county where the principal offense is committed. Section 792 of the Penal Code provides that: "The jurisdiction of a criminal action

against a principal in the commission of a public offense, when such principal is not present at the commission of the principal offense, is in the same county it would be under this code if he were so present and aiding and abetting therein.'' (See *People* v. *King*, 30 Cal.App.2d 185 [85 P.2d 928]; cases collected 7 Cal.Jur. p. 915, § 61.)

Under the facts the contention of Wallace is unsound because the evidence shows a continuous chain of acts starting, so far as Thomas is concerned, on April 22, 1944, the date of the alleged accident, and, so far as Wallace is concerned, on April 24th or 27th, when he first started to treat Thomas, down to October 27, 1944, when the civil action was dismissed. The evidence shows that Wallace communicated both orally and in writing with Bleuel after suit was filed in regard to Thomas' condition. The evidence also shows that he gave a deposition knowing it was to be used by Thomas in the civil action. Wallace knew that the impact of such acts would be felt in Alameda County and he knew that such acts were intended to culminate in a trial or settlement in Alameda County. These acts by Wallace were indispensable to the success of Thomas' scheme. Medical information concerning Thomas was an essential requirement for the successful culmination of the damage action. Certainly these acts bring Wallace within the definition of a principal as that term is defined in section 31 of the Penal Code, *supra*. Certainly these acts aided or abetted or encouraged the commission of the offense. (See *People* v. *Menne*, 4 Cal.App.2d 91 [41 P.2d 383]; *People* v. *Descant*, 51 Cal.App.2d 343 [124 P.2d 864].)

It must be remembered that in order to find that Alameda County had jurisdiction it is only necessary to find that some act of Wallace constituting an attempt had its effect in Alameda County. Section 781 of the Penal Code provides: ''When a public offense is committed in part in one county and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more counties the jurisdiction is in either county.'' Under this section either Alameda or Fresno Counties were proper counties to try the charged offense.

It is no answer to contend, as does Wallace, that an attempt was completed before he became a participant. If that be assumed, it will be noted that section 781, *supra*, is not limited to those acts or effects of acts occurring prior to the instant

the offense became sufficiently complete to warrant prosecution—it likewise applies to acts "requisite to the consummation of the offense." This precise point was involved in *People* v. *Megladdery,* 40 Cal.App.2d 748 [106 P.2d 84]. In the quotation that follows the word "respondent" refers to the defendant, while the word "appellant" refers to the People—the state being the appellant in that case. At page 775 this court declared: "By his second contention respondent would limit the essential or necessary elements of an offense or its effects to those acts or effects of acts occurring prior to the instant that the offense becomes sufficiently complete to warrant prosecution. Under the interpretation we have already given to the section, this construction cannot be sustained. That the interpretation contended for by the appellant is the correct one is demonstrated by a reference to the cases. In *People* v. *Graves,* 137 Cal.App. 1 [29 P.2d 807, 30 P.2d 508], defendant was charged, in Los Angeles County, with the crime of *receiving* and *agreeing to receive* a bribe to vote as a supervisor of that county in favor of a certain proposal then pending before the board. The evidence showed that the bribe money was paid to the defendant in San Francisco. Apparently, there was no evidence where the agreement to accept the bribe was made. The appellate court held that since the evidence showed the money was given for the vote of appellant, and since that vote was given in Los Angeles, that was sufficient to give Los Angeles jurisdiction. In other words, the dishonest vote was not an essential part of the crimes charged, and the crime was complete before the vote was given, but, nevertheless, it was held, and properly so, that Los Angeles had jurisdiction—the vote was a legal effect of the corrupt agreement, and that gave Los Angeles jurisdiction. This case completely refutes the arguments of respondent on this point." (See, also, *People* v. *Boggess,* 194 Cal. 212 [228 P. 448]; *People* v. *Anderson,* 3 Cal.App.2d 521 [40 P.2d 270]; *People* v. *Grubb,* 24 Cal.App. 604 [141 P. 1051], and the other cases cited in the Megladdery opinion at page 777. The court concluded its discussion as follows (p. 777): "Under the rule announced by these cases we must hold that if any portion of the crimes charged was committed in Alameda County, or if any act requisite to the completion of the offenses or requisite to the achievement or end of the unlawful purpose occurred

in Alameda County, that county has jurisdiction." That statement is equally applicable here.

The other points raised do not warrant discussion.

The judgment and order appealed from are affirmed.

Ward, J., and Bray, J., concurred.

A petition for a rehearing was denied April 9, 1947, and appellant Wallace's petition for a hearing by the Supreme Court was denied April 21, 1947.